**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RUPINDER SINGH, JEFFREY S. POPKIN, JONI WALKER, and JENNY MARK, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>          v.<br><br>DELOITTE LLP, THE BOARD OF DIRECTORS OF DELOITTE LLP, THE RETIREMENT COMMITTEE OF DELOITTE LLP and JOHN DOES 1-30,<br><br>                                        Defendants | Case No. 2:21-cv-08458-JGK |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

### TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................. 1

II.   STATEMENT OF FACTS ............................................................................... 3

    A.    The Plans ............................................................................................... 3

    B.    The Plans' Fees and Expenses ............................................................. 4

    C.    The Complaint's Claims ....................................................................... 7

III.  ARGUMENT .................................................................................................. 8

    A.    Standard of Review ............................................................................... 8

    B.    Plaintiffs Lack Standing to Pursue Most of Their Claims .................... 9

        1.    Plaintiffs Lack Standing to Pursue Claims Regarding the
             Profit Sharing Plan ................................................................... 9

        2.    Plaintiffs Lack Standing to Pursue Claims Regarding Four of
             the Six Challenged Funds ........................................................ 11

    C.    The Complaint Fails to State Any Plausible Claims of Fiduciary Breach ........... 13

        1.    The Complaint's Criticism of the Plans' Alleged
             Recordkeeping Fees Fails to Create Any Plausible Inference
             of Imprudence. ......................................................................... 13

        2.    The Complaint's Challenge to Six Investment Options Fails to
             Create Any Plausible Inference of Imprudence ........................ 19

    D.    The Complaint's Derivative Failure-to-Monitor Claim Likewise Fails ............. 22

IV.   CONCLUSION................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
  2021 WL 3932029 (E.D. Wis. Sept. 2, 2021) ........................................................ 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................. 8, 9

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
  756 F. Supp. 2d 330 (S.D.N.Y. 2010) ...................................................................... 3

*Barchock, v. CVS Health Corp.*,
  886 F.3d 43 (1st Cir. 2018) .................................................................................... 20

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................. 8

*Brown v. Daikin Am., Inc.*,
  2021 WL 1758898 (S.D.N.Y. May 4, 2021) ........................................................... 18

*Conn. v. Physicians Health Servs. of Conn., Inc.*,
  287 F.3d 110 (2d Cir. 2002) .............................................................................. 10, 11

*In re Constellation Energy Grp., Inc.*,
  738 F. Supp. 2d 602 (D. Md. 2010) ........................................................................ 22

*David v. Alphin*,
  817 F. Supp. 2d 764 (W.D.N.C. 2011) ................................................................... 12

*Davis v. Salesforce.com, Inc.*,
  2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) ........................................................... 21

*Davis v. Wash. U. in St. Louis*,
  960 F.3d 478 (8th Cir. 2020) .................................................................................. 20

*Dezelan v. Voya Ret. Ins. and Annuity Co.*,
  2017 WL 2909714 (D. Conn. July 6, 2017) ........................................................... 10

*In re Duke Energy ERISA Litig.*,
  281 F. Supp. 2d 786 (W.D.N.C. 2003) ................................................................... 22

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ................................................................................................. 8

*Forman v. TriHealth*,
2021 WL 4346764 (S.D. Ohio Sept. 24, 2021) ...................................................17

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
463 U.S. 1 (1983)..............................................................................................10

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) ............................................................................19

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)...........................................................................................11

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022)................................................................................2, 8, 14

*Johnson v. PNC Fin. Servs. Grp.*,
2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) ....................................................16

*Kamen v. American Tel. & Tel. Co.*,
791 F.2d 1006 (2d Cir. 1986)..............................................................................8

*Kendall v. Pharm. Prod. Dev., LLC*,
2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) .............................................20, 21

*Kong v. Trader Joe's Co.*,
2020 WL 5814102 (C.D. Cal. Sept. 24, 2020) ..................................................20

*Kong v. Trader Joe's Co.*,
2020 WL 7062395 (C.D. Cal. Nov. 30, 2020).....................................................20

*Lange v. Infinity Healthcare Physicians*,
2021 WL 3022117 (W.D. Wis. July 16, 2021)...................................................12

*LaRue v. DeWolff, Boberg & Assocs.*,
552 U.S. 248 (2008)...........................................................................................12

*Leimkuehler v. Am. United Life Ins. Co.*,
713 F.3d 905 (7th Cir. 2013) ..............................................................................6

*In re LinkedIn ERISA Litig.*,
2021 WL 5331448 (N.D. Cal. Nov 16, 2021) ..............................................11, 12

*Loomis v. Exelon Corp.*,
658 F.3d 670 (7th Cir. 2011) ............................................................................19

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..............................................................................................8

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000)..............................................................8

*Marks v. Trader Joe's Co.*,
   2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) ...................................3, 13

*Mator v. WESCO Distrib., Inc.*,
   2021 WL 4523491 (W.D. Pa. Oct. 4, 2021) ...................................16, 17

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010)...................................................5

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ............................................................20

*Obeslo v. Great-W. Capital Mgmt., LLC*,
   2020 WL 4558982 (D. Colo. 2020) ....................................................21

*Parmer v. Land O'Lakes, Inc.*,
   518 F. Supp. 3d 1293 (D. Minn. 2021).............................................21, 22

*Patterson v. Morgan Stanley*,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ....................................3, 12

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.
   Morgan Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013).......................................................2, 8, 9, 19

*Perkins v. United Surgical Partners Int'l, Inc.*,
   No. 3:21-cv-00973 (N.D. Tex. March 18, 2022) .............................12, 21

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
   2016 WL 7494320 (D. Conn. Dec. 30, 2016).......................................19

*Rosenkranz v. Altru Health Sys.*,
   2021 WL 5868960 (D.N.D. Dec. 10, 2021).......................................21, 22

*In re SLM Corp. ERISA Litig.*,
   2010 WL 3910566 (S.D.N.Y. Sept. 24, 2010)...................................10, 11

*Smith v. CommonSpirit Health*,
   2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ...............................13, 21, 22

*Spano v. The Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) .............................................................12

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016).........................................................................8, 9

*Thole v. U.S. Bank N.A.*,
  140 S. Ct. 1615 (2020) ..................................................................................9, 11

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ...............................................................................2

*Wehner v. Genentech, Inc.*,
  2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...................................................21, 22

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...............................................13, 19

*White v. Chevron Corp.*,
  2017 WL 2352137 (N.D. Cal. May 31, 2017) .......................................................19

*White v. Chevron Corp.*,
  752 F. App'x 453 (9th Cir. 2018) .........................................................................9

*Wildman v. Am. Century Servs., LLC*,
  2018 WL 2326627 (W.D. Mo. May 22, 2018) ........................................................6

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) ......................................................................17, 18

**Statutes**

Employee Retirement Income Security Act ("ERISA"),
  29 U.S.C. §§ 1001-1461 ............................................................................. *passim*

29 U.S.C. § 1002(34) ..............................................................................................3

29 U.S.C. § 1104(a)(1)(A)(ii) .................................................................................16

29 U.S.C. § 1104(a)(1)(B) .....................................................................................2, 7

29 U.S.C. §§ 1132(a)(3) ..................................................................................1, 10, 11

**Rules**

Fed. R. Civ. P. Rule 12(b)(1) .................................................................................8

Fed. R. Civ. P. Rule 12(b)(6) ..............................................................................3, 8

**Regulations**

29 C.F.R. § 2550.404a-5 .........................................................................................6

**Other Authorities**

Dep't of Labor, Emp. Benefits Sec. Admin., Tips for Selecting and Monitoring
    Service Providers for Your Employee Benefit Plan, available at,
    https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-
    activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-
    service-providers.pdf ......................................................................................16, 18

Dep't of Labor, Employee Benefits Security Administration, A Look at 401(k)
    Plan Fees (Dec. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-
    ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf........................6

Dep't of Labor, Understanding Retirement Plan Fees and Expenses (Dec. 2011),
    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
    activities/resource-center/publications/understanding-retirement-plan-fees-
    and-expenses.pdf..........................................................................................................5

## I.   <u>INTRODUCTION</u>

This case is one of the latest in a deluge of putative class-action lawsuits asserting that the fiduciaries of an employer's 401(k) retirement plan breached their duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, by allegedly utilizing an imprudent process to administer the plan.  As in many such cases, the Complaint here does not include any allegations about the actual process the fiduciaries of the Deloitte 401(k) Plan (the "401(k) Plan") and the Deloitte Profit Sharing Plan (the "Profit Sharing Plan") (together, the "Plans") used.  Instead, the Complaint rests on a handful of circumstantial assertions that fail to support an inference of imprudence.

Even before the Court addresses the merits of the claims, almost all of them should be dismissed for lack of standing.  First, Plaintiffs' claims regarding the Profit Sharing Plan should be dismissed because none of the Plaintiffs ever participated in that plan and therefore suffered no constitutionally cognizable injury related to it.  And even if the Court were ultimately to determine that participants in the Profit Sharing Plan were entitled to recover the remedy sought here, that recovery would flow to *participants in the Profit Sharing Plan,* not to Plaintiffs.  Moreover, to bring a claim on behalf of the Profit Sharing Plan under ERISA, Plaintiffs must be "a participant, beneficiary, or fiduciary" of that plan—which they are not.  *See* 29 U.S.C. §§ 1132(a)(3).

Second, the Complaint challenges six plan investment offerings as imprudent—but between them, Plaintiffs invested in only *two* of those offerings.  Instead, while participating in the 401(k) Plan, Plaintiffs have always invested their plan assets in different investment options the Complaint does not challenge, with only two exceptions.  This means Plaintiffs have not suffered any injury-in-fact related to four of the challenged funds, and therefore lack Article III standing to pursue their claims regarding those funds.

The Complaint fairs no better on the merits.  ERISA's duty of prudence is rooted in process,

not results.  *See* 29 U.S.C. § 1104(a)(1)(B); *see also, e.g., Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*St. Vincent*"), 712 F.3d 705, 718 (2d Cir. 2013).  The Supreme Court recently reiterated that even at the pleadings stage, courts evaluating ERISA fiduciary-breach claims "must give due regard to the range of reasonable judgments a fiduciary may make."  *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).  The Supreme Court's holding is not surprising given the discretion owed fiduciaries in these circumstances.  *See Tussey v. ABB, Inc.,* 746 F.3d 327, 334 (8th Cir. 2014) (fiduciaries are afforded discretion in administering a retirement plan under ERISA).  But the Complaint is devoid of any allegations about the Plans' process.  Nor does it allege that the Plans' fees fell outside the "range of reasonable judgments" fiduciaries make.  Instead, the Complaint asks the Court to infer the Plans' process was imprudent based on two sets of circumstantial, results-oriented allegations.  First, the Complaint alleges imprudence based on the assertion that the Plans' alleged recordkeeping fees were more expensive—in a single year—than those allegedly paid by seven other plans.  Second, the Complaint separately challenges six investments as "imprudent," asserting the funds were more expensive than the "medians" and "averages" for their investment categories.  Neither suffices to state a plausible claim.

The Court should also dismiss Plaintiff's ancillary failure-to-monitor claim in Count II, as it is derivative of the Complaint's core claim of fiduciary breach, and so fails along with it.

For these reasons, Deloitte LLP, the Board of Directors of Deloitte LLP, and the Retirement Committee of Deloitte LLP (collectively, "Deloitte"), respectfully request that the Court grant this motion and dismiss Plaintiffs' Complaint in its entirety with prejudice.

II.     **STATEMENT OF FACTS**[1]

    A.     **The Plans**

The Plans are one way Deloitte helps its employees to prepare for retirement.  The Plans are participant-directed defined-contribution 401(k) plans established under ERISA, 29 U.S.C. § 1002(34).  Compl. ¶ 42.  The Plans allow Deloitte employees to save for retirement on a tax-deferred basis.  *Id.* ¶ 44.

The 401(k) Plan is available to full-time employees who are not partners, principals, or managing directors.  *Id.* ¶ 43.  Plaintiffs each allege they participated in the 401(k) Plan.  *Id.* ¶¶ 17-20.  Deloitte adds to participants' savings in the 401(k) Plan through employer matching contributions.  *Id.* ¶¶ 44-45.  During the relevant period, Deloitte matched 25% of participants' before-tax contributions up to 6% of participants' annual compensation.  *Id.* ¶ 45.  Between 2015 and 2020 alone, Deloitte voluntarily contributed over $384,000,000 in employer matches to 401(k) Plan participants, an amount vastly larger than the monetary relief sought here.[2]

---

[1] This summary comes from Plaintiffs' allegations or from publicly-available documents referenced in the Complaint, which are appropriately considered on a Rule 12(b)(6) motion.  *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 756 F. Supp. 2d 330, 344-45 (S.D.N.Y. 2010).  In particular, the Court may consider the publicly-available Forms 5500 filed with the DOL, *see, e.g., Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *4 (C.D. Cal. Apr. 24, 2020), and the Plan's annual fee disclosure pursuant to DOL regulations, *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019).

[2] These amounts increased every year. *See* Ex. 1, 2014/2015 401(k) Plan Form 5500, Fin. Stmts. at 4 ($47,541,851); Ex. 2, 2015/2016 401(k) Plan Form 5500, Fin. Stmts. at 4 ($55,518,938); Ex. 3, 2016/2017 401(k) Plan Form 5500, Fin. Stmts. at 4 ($61,092,095); Ex. 4, 2017/2018 401(k) Plan Form 5500, Fin. Stmts. at 4 ($66,374,492); Ex. 5, 2018/2019 401(k) Plan Form 5500, Fin. Stmts. at 4 ($72,955,198); Ex. 6, 2019/2020 401(k) Plan Form 5500, Fin. Stmts. at 4 ($81,004,416).

The Profit Sharing Plan is, on the other hand, "limited to all Principals and Partners (collectively 'Partners') and Managing Directors ('Directors') who meet the eligibility requirements of the Plan." *Id.* (quoting 2020 Profiting Sharing Plan Audit Report at 5).  None of the Plaintiffs allege they ever participated in the Profit Sharing Plan.  *Id.* ¶¶ 17-20.  Participants in the Profit Sharing Plan are not required to make contributions to that plan; instead, Deloitte makes "age-based contributions as a percentage of compensation on behalf of each eligible Director each Plan year."  *Id.* ¶ 44 (quoting 2020 Profit Sharing Plan Auditor Report at 5).  Between 2015 and 2020, Deloitte voluntarily contributed over $1,180,000,000 to Profit Sharing Plan participants— again, an amount far in excess of the relief sought in this lawsuit.[3]

During the putative class period, the Plans offered participants a diverse menu of investment options, including a suite of target-date funds (the Vanguard Target Retirement Trust Select funds); another 28 to 55 investment options (depending on the year) that covered different asset classes, investment styles (actively managed funds and passively managed "index" funds), and risk-reward profiles; and a managed-account option. Of those dozens of investment options, the Complaint challenges only six offerings.  *See* Compl. ¶¶ 84-85.

**B.    The Plans' Fees and Expenses**

Like all 401(k) plans, there are expenses associated with the management and administration of the Plans.  These include: (1) investment-management fees, *i.e.*, "ongoing

---

[3] Again, these contributions increased every year.  *See* Ex. 7, 2014/2015 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($176,518,569); Ex. 8, 2015/2016 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($181,494,076); Ex. 9, 2016/2017 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($193,166,721); Ex. 10, 2017/2018 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($198,838,324); Ex. 11, 2018/2019 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($211,137,786); Ex. 12, 2019/2020 Profit Sharing Plan Form 5500, Fin. Stmts. at 4 ($218,955,075).

charges for managing the assets of the investment fund;" and (2) administrative or "recordkeeping" fees that encompass the "day-to-day" expenses for "basic administrative services … necessary for administering the plan as a whole."[4]

An investment option states its investment-management fee in the form of an "expense ratio"—*i.e.*, a percentage-based deduction against a participant's total assets in the investment. Compl. ¶ 78. For instance, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. *Id.* In 2015, the Plans offered investments with expense ratios ranging from 0.02% to 1.25%, and by 2021, the Plans' investment options were offered at even lower fees, ranging from just 0.01% to 1.09%.[5] Each of the six investments challenged by the Complaint had its own expense ratio—as disclosed in the 401(k) Plan's annual participant disclosures—ranging from 0.34% to 0.89%.[6]

The Plans also contract with a recordkeeper, Vanguard, to provide recordkeeping services for participants in both Plans. Compl. ¶ 62. Expenses paid to a recordkeeper may go toward "day-to-day operation of a 401(k) plan" and encompass "expenses for basic and necessary

---

[4] *See* Dep't of Labor, Understanding Retirement Plan Fees and Expenses at 3, 5 (Dec. 2011), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited March 17, 2022).

[5] *See* Ex. 13, 2015 401(k) Plan 404a-5 Participant Disclosure at PDF pp. 6-13; Ex. 19, 2021 401(k) Plan 404a-5 Participant Disclosure at PDF pp. 6-11.

[6] The Complaint incorrectly states the expense ratio of the Vanguard Explorer Value Fund as 0.55% in 2020. Compl. ¶¶ 84-85. The 2020 404a-5 Participant Disclosure (which was available to Plaintiffs and all plan participants) states that the fund's expense ratio was only 0.34%. *See* Ex. 18, 2020 401(k) Plan 404a-5 Participant Disclosure at PDF p 8. The Court need not accept as true allegations that are contradicted by matters properly subject to judicial notice. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010).

administrative services, such as plan recordkeeping, accounting, legal, and trustee services."[7]  As the Complaint acknowledges, recordkeeping expenses may be paid directly from plan assets, indirectly through a process called "revenue sharing," or through some combination of both.  *Id.* ¶ 59.  Revenue sharing is "an arrangement allowing mutual funds to share a portion of the fees that they collect from investors with entities that provide services to the mutual funds," such as recordkeepers, and is entirely legal.  *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013).  When a plan uses revenue-sharing on certain investments, the total fees paid by participants (for investment management and recordkeeping) are reflected in the investments' expense ratios.[8]

The Complaint alleges that the Plans used a combination of direct and indirect payments to cover recordkeeping costs to Vanguard.  Compl. ¶ 62.  Throughout the relevant period, participants paid a fixed annual fee for recordkeeping services assessed as a quarterly charge against each participant's account.  As reflected in the 401(k) Plan's annual fee disclosures— which Plaintiffs and all participants receive every year per DOL regulations, 29 C.F.R. § 2550.404a-5—the annual recordkeeping fees paid to Vanguard decreased from $40 per

---

[7] *See* Dep't of Labor, Employee Benefits Security Administration, A Look at 401(k) Plan Fees at 3 (Dec. 2019) ("DOL Fee Publication"), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited March 17, 2022).

[8] In the example above, the investment manager could pay a portion of the 0.75% expense ratio that it collects (*i.e.*, "sharing" some of its "revenue") to the plan's recordkeeper for services.  Compl. ¶ 59.  Under a revenue-sharing structure, a recordkeeper often "rebates" back to the plan the unused portion of fees it collects through expense ratios, and those rebates "can be used to pay for services like third-party consultants, plan audits, or paid back to plan participants." *Wildman v. Am. Century Servs., LLC*, 2018 WL 2326627, at *2 (W.D. Mo. May 22, 2018).

participant at the start of the relevant period, to $24 per participant in 2021.[9]  The Complaint alleges

the Plans also employed revenue sharing from some of the investment options.  Compl. ¶ 62.  But

Plaintiffs do not allege that they invested in any of the investment options that paid revenue-

sharing.

In challenging the Plans' fees, the Complaint purports to tabulate the Plans' annual fees

per participant by using data from the Plan's Forms 5500 to divide a total estimated recordkeeping

fee for each year by the number of participants with account balances.  In turn, the Complaint

alleges that from 2015 through 2019, the 401(k) Plan paid between $59.58 and $70.31 annually

per participant in recordkeeping fees.  *Id.* ¶ 63.  Similarly, the Complaint alleges that during the

same period the Profit Sharing Plan paid between $221.29 and $331.01 annually per participant.

*Id.*

## C.    <u>The Complaint's Claims</u>

The Complaint asserts two claims.  In Count I, the Complaint asserts the Committee

breached its fiduciary duty of prudence under ERISA, 29 U.S.C. § 1104(a)(1)(B), because the

Plans: (i) allegedly "saddled Plan participants with above-market" recordkeeping fees, and (ii)

allegedly included six investments (out of dozens of participant investment options) with

"excessively high" investment-management fees.  Compl. ¶¶ 58-69, 84-86.  In Count II, the

Complaint alleges that Deloitte failed to adequately monitor the Committee with respect to the

Plan's fees.  *Id*. ¶¶ 94-100.  The Complaint seeks class-wide relief on behalf of more than 88,000

participants.  *Id*. ¶ 35.

---

[9] *See* Exs. 13-19, 2015-2021 401(k) Plan 404a-5 Participant Disclosures at PDF p. 4.

### III.    ARGUMENT

####    A.    Standard of Review

*Rule 12(b)(1)*.  Article III limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. There is no case or controversy if a plaintiff lacks standing to sue. *See Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)).  Article III "constitutional" standing requires the plaintiff to have suffered an injury-in-fact that is fairly traceable to the defendant's action and is able to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where the plaintiff lacks standing, a court must dismiss the complaint for lack of subject-matter jurisdiction.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  On a Rule 12(b)(1) motion, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings. *Id.; see also Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986).

*Rule 12(b)(6)*.  In assessing ERISA claims of fiduciary breach under Rule 12(b)(6), courts must apply the pleading standards described in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), by evaluating a complaint's allegations "as a whole" and "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742.  "Because the content of the duty of prudence turns on 'the circumstances … prevailing' at the time the fiduciary acts," courts must undertake a "careful, context-sensitive scrutiny of a complaint's allegations" to "divide the plausible sheep from the meritless goats." *Id*; *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

To avoid dismissal under Rule 12(b)(6), Plaintiffs' Complaint must first contain well-pleaded, plausible factual allegations that Deloitte failed to utilize a prudent process in administering the Plans. *St. Vincent*, 712 F.3d at 718.  Failing that, the pleading may survive a

motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed." *Id.* (internal quotation marks omitted).  In turn, where there are "two possible explanations, only one of which can be true and only one of which results in liability, plaintiff [] cannot offer allegations that are 'merely consistent with' [its] favored explanation but are also consistent with [an] alternative explanation." *White v. Chevron Corp.* ("*White III*"), 752 F. App'x 453, 454 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2646 (2019) (citation omitted); *see also Iqbal*, 556 U.S. at 678-79, 682 (holding that "a complaint [that] pleads facts that are 'merely consistent with' a defendant's liability" will not survive) (citation omitted). The Second Circuit has recognized that "the prospect of discovery" is "ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *St. Vincent*, 712 F.3d at 718-19.

**B.** **Plaintiffs Lack Standing to Pursue Most of Their Claims**

**1.** **Plaintiffs Lack Standing to Pursue Claims Regarding the Profit Sharing Plan**

Before turning to the implausibility of the Complaint's allegations, the Court should dismiss the claims regarding the Profit Sharing Plan at the threshold because Plaintiffs do not and cannot demonstrate standing to pursue them.

To start, Plaintiffs lack Article III standing.  In the Supreme Court's words, "[t]here is no ERISA exception to Article III" and its standing requirements. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).  The "irreducible constitutional minimum of standing consists of three elements"—*i.e.*, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338.  Plaintiffs fail to satisfy the first and second elements.

9

First, they have not alleged they were injured by the purported mismanagement of the Profit Sharing Plan, because they do not (and cannot) allege they were *participants* in that plan. *See* Compl. ¶¶ 17-20; *Dezelan v. Voya Ret. Ins. and Annuity Co.*, 2017 WL 2909714, at *6 (D. Conn. July 6, 2017) (dismissing claim on standing grounds).

Second, Plaintiffs lack standing because "[n]one of the remedies being sought [in connection with claims regarding the Profit Sharing Plan] would flow to" them. *Conn. v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 118 (2d Cir. 2002) (affirming decision that the plaintiff lacked standing). Plaintiffs request that, in the event of a favorable judgment, any losses incurred by the Profit Sharing Plan be paid to the *Profit Sharing Plan*. *See* Compl. at Prayer for Relief ¶¶ D-F. Judge Pauley held, in a similar situation, that plaintiffs suing on behalf of two retirement plans lacked constitutional standing to sue regarding a plan they did not participate in because "[i]f the finder of fact were ultimately to conclude that participants in the [plan] were entitled to recover the remedy sought here—repayment of losses—that recovery would flow to participants of the [plan], not [plaintiffs]." *In re SLM Corp. ERISA Litig.*, 2010 WL 3910566, at *12 (S.D.N.Y. Sept. 24, 2010), *aff'd sub nom. Slaymon v. SLM Corp.*, 506 F. App'x 61 (2d Cir. 2012). The Second Circuit reached the same conclusion as Judge Pauley, and affirmed dismissal of the plaintiffs' claim for lack of standing because plaintiffs "were never participants" in the second challenged plan and therefore "[could] not satisfy redressability." 506 F. App'x at 65. The same is true here.

Further, ERISA requires that a plaintiff suing on behalf of a plan be "a participant, beneficiary, or fiduciary" of that plan. 29 U.S.C. §§ 1132(a)(3). Those sections "carefully enumerate[] the parties entitled to seek relief" and "do[] not provide anyone other than participants, beneficiaries, or fiduciaries with an express cause of action*." Franchise Tax Bd. of State of Cal.*

*v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27 (1983) (interpreting ERISA § 502(a)(3)). Therefore, "parties other than those explicitly named therein—plan participants, beneficiaries, and fiduciaries—may not bring suit." *Phys. Health Servs.*, 287 F.3d at 112, 120-21 (affirming dismissal). Because "Plaintiffs do not claim to be participants, beneficiaries, or fiduciaries" of the Profit Sharing Plan, they cannot bring claims on behalf of that plan, and those claims must be dismissed. *In re SLM Corp. ERISA Litig.*, 2010 WL 3910566, at *12 (dismissing claims and interpreting the issue as one of statutory standing).

> **2.      Plaintiffs Lack Standing to Pursue Claims Regarding Four of the Six Challenged Funds**

Plaintiffs also lack standing to pursue their imprudent-investment claim regarding four of the six funds challenged in the Complaint. The Plans here are defined-contribution individual-account plans. Compl. ¶ 42. This means that a participant's benefit is "based *solely* on the amounts allocated to each individual's account." *Id*. (emphasis added); *see Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (in a defined contribution plan "each beneficiary is entitled to whatever assets are dedicated to his individual account"). The necessary corollary to this principle is that the performance or fees associated with investment options that a plan participant did not select for his individual account do not and cannot impact that participant's benefit. For these reasons, "[s]ince *Thole*, district courts across the country have largely held that ERISA plaintiffs do not have standing to challenge the offering of specific funds that they did not allege that they personally invested in." *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *4 (N.D. Cal. Nov 16, 2021) (collecting cases).

Here, the Complaint's imprudent-investment claim focuses on six—and only six—investment options that were allegedly too "expensive." Compl. ¶¶ 84-85. But Plaintiffs do not and cannot allege that they invested in four of the six challenged funds, because during the relevant

11

period Plaintiffs invested their 401(k) Plan assets in other funds that they do not challenge. Declaration of Stephanie Aeder ("Aeder Decl."), ¶ 3.  As such, Plaintiffs cannot have suffered any personalized, concrete injury-in-fact related to any of the four challenged investments they did not invest in.  The allegedly "excessive" fees for those funds did not impact Plaintiffs' individual 401(k) Plan accounts, which were invested exclusively in other investment options.  *See LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 256 (2008) (confirming that ERISA "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account").

Applying these same standing principles to similar facts, courts routinely dismiss ERISA fiduciary-breach claims challenging investment options that a plaintiff did not select for lack of Article III standing—including one court that ruled on a nearly identical issue just today.  *Perkins v. United Surgical Partners Int'l, Inc.*, No. 3:21-cv-00973, at *9 (N.D. Tex. March 18, 2022) (holding plaintiffs lacked standing where they "fail[ed] to allege injury to their own investment accounts or their investment in . . . the challenged funds").  *See also Patterson*, 2019 WL 4934834, at *5 (holding that plaintiff had no Article III standing to pursue investment-related fiduciary-breach claims as to investments he never selected for his personal account); *Lange v. Infinity Healthcare Physicians*, 2021 WL 3022117, at *2-4 (W.D. Wis. July 16, 2021) (holding that "a plaintiff lacks standing to challenge investment decisions that did not personally affect her" and dismissing investment-related ERISA fiduciary-breach claims on this basis); *accord In re LinkedIn Litig.*, 2021 WL 5331448, at *4 (similar);  *David v. Alphin*, 817 F. Supp. 2d 764, 781-82 (W.D.N.C. 2011) (similar, dismissing ERISA fiduciary-breach claims where plaintiffs could not show or "explain how [allegedly] improper or excessive fees ha[d] any effect on their … benefits"), *aff'd*, 704 F.3d 327 (4th Cir. 2013); *see also Spano v. The Boeing Co.,* 633 F.3d 574, 586 (7th Cir. 2011)

("It is not enough to say that the named plaintiffs want relief for the plan as a whole" because at a minimum the named plaintiffs "need to have invested in the same fund as the [putative] class members").  The same result should follow here.

### C.     The Complaint Fails to State Any Plausible Claims of Fiduciary Breach

#### 1.     The Complaint's Criticism of the Plans' Alleged Recordkeeping Fees Fails to Create Any Plausible Inference of Imprudence.

The Complaint asks the Court to infer that the fiduciaries' process was imprudent because the alleged recordkeeping fee amounts that the Plan paid to Vanguard during the relevant period were "excessive."  Compl. ¶¶ 59-73.  The Complaint purports to make this inferential leap by comparing the Plans' alleged fees to the alleged fees of seven other retirement plans from a single year.  For several independent but mutually reinforcing reasons, these allegations fail.[10]

First, the very premise of the Complaint's recordkeeping-fee claim—that the Plans' fees are indicative of an imprudent process because a few other plans paid less—cannot be enough to state a plausible claim.  There are thousands of 401(k) retirement plans.  Even being conservative, and assuming there are only 1,000 retirement plans across the country, the Complaint alleges the Plans paid more in recordkeeping fees than 0.7% of them (7 out of 1,000 = 0.7%).  That cannot create an inference that the Plans' fees were outside the "range of judgments" fiduciaries make.

---

[10] Plaintiffs' throwaway allegation that "there is little to suggest that Defendants conducted a RFP at reasonable intervals" (Compl. ¶ 72) is irrelevant to whether the Complaint has stated a plausible claim of imprudence. "[N]othing in ERISA compels periodic competitive bidding."  *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("*White I*"); *see also Marks*, 2020 WL 2504333, at *7 (similar). Further, "[b]ecause Plaintiff has failed to allege facts plausibly showing that the recordkeeping fees paid were excessive, it makes no difference that [she] alleges Defendants engaged in no examination, comparison, or benchmarking of the Plan's recordkeeping fees." *CommonSpirit Health,* 2021 WL 4097052, at *12 (E.D. Ky. Sept. 8, 2021), *appeal filed,* No. 21-5964 (6th Cir.).

*Hughes*, 142 S. Ct. at 740; *see, e.g., Albert v. Oshkosh Corp.*, 2021 WL 3932029, at *5 (E.D. Wis. Sept. 2, 2021) ("[T]he mere existence of purportedly lower fees paid by other plans says nothing about the reasonableness of the Plan's fee."), *appeal filed*, No. 21-2789 (7th Cir.).

Further, the Complaint's allegations are particularly misplaced here because they turn on fee comparisons from *a single year* (2019) across the six-year putative class period. The Complaint offers no allegations as to the fees that the alternate plans paid in any other year, let alone how those amounts compared to the amounts allegedly paid by the Deloitte Plans. That sort of superficial and spotty assessment is meaningless. After all, one need only apply the Complaint's rubric to the same publicly-available data for the following year, 2020, to see that the fees for at least two of Plaintiff's comparator plans *increased* significantly. Based on this data and the 2020 404a-5 Participant Disclosure showing that the Deloitte Plans paid only $32 annually per participant for recordkeeping services in 2020, the Plans' fees are in line with those of the so-called comparable plans, and indeed are *lowe*r than most of them.

**Plaintiff's "Comparable" Plans' Recordkeeping Fees (2020)[11]**

| Plan | Participants | Assets | RPS Fee | RPS Fee/pp | Recordkeeper |
|---|---|---|---|---|---|
| The Dow Chemical Company Employee Savings Plan | 35,761 | $11,502,338,834 | $1,386,940 | $39 | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 48,263 | $4,523,681,952 | $1,821,809 | $38 | Vanguard |

[11] The per-participant calculations are based on the plans' 2020 Forms 5500.  *See* Ex. 20, 2020 Form 5500 for the Dow Plan; Ex. 21, 2020 Form 5500 for the Kaiser Plan.  Specifically, "Participants" are drawn from Line 6g, "Assets" are drawn from Schedule H, Part I, Line 1*l* column (b), and "RPS Fee" comes from Schedule C.  This is the same approach the Complaint uses in building its chart.  Compl. ¶ 66.

14

In any event, this exercise illustrates the arbitrary nature of the Complaint's recordkeeping-fee allegations. Indeed, by Plaintiffs' own logic, the Dow Chemical and Kaiser Permanente plans would be imprudent, because their recordkeeping fees in 2020 were higher than both (1) the $35 that Plaintiffs allege similarly sized plans pay on average (Compl. ¶ 69); and (2) the recordkeeping fees allegedly paid by the Publicis, Deseret, WWP Group, Sutter Health, and Danaher plans (*id.* ¶ 66). In short, a limited set of supposed fee data related to a few different plans (many with different recordkeepers) from a single year says nothing about the reasonableness of the Deloitte Plans' recordkeeping fees, much less about the prudence of the fiduciaries' process.

Second, the Complaint's proffered fee calculations are inconsistent because they are comparing apples to oranges. As the Complaint recognizes, "[r]ecordkeeping expenses can be … paid:" (1) "directly from plan assets"; (2) "indirectly by the plan's investments in a practice known as revenue sharing"; or (3) "a combination of both." Compl. ¶ 59. And the Complaint specifically alleges that any assessment of fees must "identify *all fees, including direct compensation and revenue sharing* being paid to the plan's recordkeeper." *Id.* ¶ 70 (emphasis added).

For the Deloitte Plans, the Complaint alleges both "direct" and "indirect" revenue sharing payments in calculating the Plan's alleged fees. *Id.* ¶ 63. But for the comparator plans, the Complaint includes only the "direct" payments and ignores the indirect revenue sharing payments that the Complaint specifically alleges have to be considered—even though all seven plans reported "indirect" revenue sharing payments to their recordkeepers as well.[12] In other words, the

---

[12] See Ex. 22, 2019 Form 5500 for the Publicis Plan, Sch. C (reporting "indirect" payment to Fidelity); Ex. 23, 2019 Form 5500 for the Deseret Plan, Sch. C (reporting "indirect" payment to Great-West); Ex. 24, 2019 Form 5500 for the Dow Chemical Plan, Sch. C (reporting "indirect" payment to Fidelity); Ex. 25, 2019 Form 5500 for the WPP Group Plan, Sch. C (reporting "indirect" payment to Vanguard); Ex. 26, 2019 Form 5500 for the Sutter Health 402(b)

Complaint violates its own standard by comparing the Deloitte Plans' total alleged recordkeeping fees to only a portion of the recordkeeping fees paid by the alternative plans.  Courts routinely reject those sorts of fragmented and dissonant allegations.  *See, e.g.*, *Johnson v. PNC Fin. Servs. Grp.*, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021) (rejecting allegations as "apples to oranges" because they "account[ed] for only direct recordkeeping fees" and ignored "revenue sharing (*i.e.* indirect fees)," which showed the other plans actually "pa[id] much more"); *Mator v. WESCO Distrib., Inc.*, 2021 WL 4523491, at * 7 (W.D. Pa. Oct. 4, 2021).  This case is no different.

Third, the Complaint's recordkeeping-fee allegations are implausible because they fixate only on the purported recordkeeping *costs*, without offering any allegations about the scope or caliber of the *services* being provided in exchange for those fees.  It is true that ERISA fiduciaries should defray "reasonable expenses."  29 U.S.C. § 1104(a)(1)(A)(ii).  But "reasonable" does not mean cheapest, and what is "reasonable" depends on far more than price alone.  As the DOL has explained, ERISA does not require fiduciaries "to pick the least costly provider," whether for recordkeeping or any other administrative services, because "[c]ost is *only one factor to be considered in selecting a service provider*."[13]  Rather, unlike the Complaint's narrow-minded theory, the DOL has made clear that fiduciaries cannot "consider fees in a vacuum" because "[t]hey are only one part of the bigger picture, including … the extent and quality of the services

---

Savings Plan, Sch. C; Ex. 27, 2019 Form 5500 for the Kaiser Plan, Sch. C (reporting "indirect" payment to Vanguard); Ex. 28, 2019 Form 5500 for the Danaher Plan, Sch. C (reporting "indirect" payment to Fidelity).

[13] *See* Dep't of Labor, Emp. Benefits Sec. Admin., Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan, available at, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (emphasis added) (last visited Mar. 17, 2022).

provided."[14]   Courts agree and routinely hold that fee-related criticisms are meaningless where "[p]laintiffs fail to allege that the fees were excessive *relative to the services rendered*." *See Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (emphasis added); *Mator*, 2021 WL 4523491, at * 7 (dismissing claim where plaintiffs "allege[d] no facts about the level of services provided to the Plan's participants in exchange for the fees paid"); *Forman v. TriHealth*, 2021 WL 4346764, at *5-6 (S.D. Ohio Sept. 24, 2021) (dismissing claim based on no allegations as to "what services the 'comparable 401(k) plans' received in exchange for their less costly fees"), *appeal filed*, No. 21-3977 (6th Cir.).

The Complaint here is similarly infirm.  It fails to allege any facts about the breadth and level of services that Vanguard provided to the Plans' participants for the challenged fee amounts. This falls short of the pleading standard.  *See, e.g.*, *Mator*, 2021 WL 4523491, at * 7.  The Complaint is likewise largely silent about the specific services that the alternative plans allegedly received from their recordkeepers in exchange for the purportedly lower fees, as well as how the scope and caliber of those services allegedly compared to those that Vanguard provided to the Deloitte Plans.  It simply asserts that the Plans were "paying higher recordkeeping fees than [their] peers."  Compl. ¶ 66.  This, too, falls short.  *E.g.*, *Forman*, 2021 WL 4346764, at *5-6.  After all, even setting aside that several of the alternate plans used a *different* recordkeeper—not Vanguard—there are always differences in the packages and levels of services that plans negotiate with their recordkeepers, based on individual considerations relevant to a particular plan and its participants.[15]

---

[14] DOL Fee Publication at 9.

[15] The Employee Benefits Security Administration of the Department of Labor explains that the services afforded to 401(k) plan participants vary widely, from basic services to a menu of additional options which, of course, drive up

Finally, in a footnote, the Complaint tacitly acknowledges that the seven comparator plans paid fees to their recordkeepers for services that differed materially in nature and scope from the services provided by Vanguard to the Deloitte Plans.  According to the Complaint, the alleged costs for the seven comparator plans "reflect fees paid to the services providers with a service code of '15' and/or '64,' which signifies recordkeeping fees."  Compl. ¶ 66 n.9.  But the 2019 Forms 5500 for the Deloitte Plans list codes for *many different services in addition to recordkeeping services* that Vanguard provided to the Plans, including consulting services (code 16), investment advisory services (code 26), and participant loan processing (code 37).  *See* Ex. 5, 2019 401(k) Plan Form 5500, Sch. C.  Thus, for example, the Complaint compares the Deloitte Plans' fees for an *array of services* against the fees paid by the Deseret 401(k) Plan in 2019 for *just recordkeeping services.*  The comparison between fees paid for completely different services is meaningless.  *See Brown v. Daikin Am., Inc.*, 2021 WL 1758898 (S.D.N.Y. May 4, 2021) (finding plaintiff's comparison between John Hancock's "excessive administrati[on] fees" and fees received by alternative recordkeepers was "illusory" because "as it pertained to the Plan, John Hancock was not only an administrative services provider, but also an investment manager for several of the Plan's investment funds"); *Young*, 325 F. App'x at 33  (affirming dismissal where "[p]laintiffs fail[ed] to allege that the fees were excessive relative to the services rendered") (internal quotations

---

the costs to them, negating the Plaintiffs' fundamental misapprehension here, that these services are somehow commoditized, such that the loose comparisons they offer yields a plausible claim:

> Plan administration fees. The day-to-day operation of a 401(k) plan involves expenses for basic and necessary administrative services, such as plan recordkeeping, accounting, legal, and trustee services. A 401(k) plan also may offer a host of additional services, such as telephone voice response systems, access to customer service representatives, educational seminars, retirement planning software, investment advice, electronic access to plan information, daily valuation, and online transactions.

*Id.*

and citations omitted); *White v. Chevron Corp.*,  2017 WL 2352137, at *16 (N.D. Cal. May 31, 2017) ("*White II*"), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (dismissing recordkeeping claims where Form 5500 for the plan showed that the challenged fees were "not only for recordkeeping services").

The Complaint's recordkeeping-fee allegations fail to create any plausible inference of fiduciary breach.

> **2.   The Complaint's Challenge to Six Investment Options Fails to Create Any Plausible Inference of Imprudence**

The Complaint also alleges that because the Plans offered six investment options (out of dozens of available offerings) that were allegedly too expensive, the Court should infer that the Plans' fiduciary process for selecting and monitoring those investment options was imprudent. Putting aside that Plaintiffs lack standing to sue regarding all but one of these funds, these allegations fall well short of the plausibility bar.

First, as the Second Circuit has held, the allegation that an investment option was too expensive must be "*combined with other alleged facts*" to give rise to an inference of imprudence. *St. Vincent,* 712 F.3d at 721.  But the Complaint offers no such allegations here.  The Complaint's myopic allegations about the challenged investments' costs are insufficient to create an inference of imprudence because "[f]iduciaries have latitude to value investment features other than price (and, indeed, are required to do so)."  *White I*, 2016 WL 4502808, at *10.  This is because "nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  *Hecker v. Deere & Co*., 556 F.3d 575, 586 (7th Cir. 2009); *accord Loomis,* 658 F.3d at 670 ("The fact that … some other funds might have had even lower ratios is beside the point."); *see also Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *10 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017).

Nor does ERISA require fiduciaries to manage a plan toward any particular benchmark. *Barchock, v. CVS Health Corp*., 886 F.3d 43, 52-53 (1st Cir. 2018). Thus, courts routinely agree that "[a]n ERISA fiduciary does not breach its duty of prudence by failing to offer the cheapest investment option." *Kendall v. Pharm. Prod. Dev., LLC,* 2021 WL 1231415, at *6 (E.D.N.C. Mar. 31, 2021); *Kong v. Trader Joe's Co.* ("*Kong II*"), 2020 WL 7062395, at *4 (C.D. Cal. Nov. 30, 2020), *appeal filed*, No. 20-56415 (9th Cir.). Yet that is all the Complaint here alleges—that a handful of the Plans' investments could have been less expensive.

Second, the Complaint's unduly narrow focus on investment cost is particularly implausible because it fails to compare the challenged investment to any "meaningful" benchmarks. "To show that a prudent fiduciary in like circumstances would have made a different decision, plaintiffs must provide a 'meaningful benchmark' against which to base a comparison." *Kendall*, 2021 WL 1231415, at *4 (quoting *Meiners v. Wells Fargo & Co*., 898 F.3d 820, 823 (8th Cir. 2018)); *Davis v. Wash. U. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). A "meaningful benchmark" is a *specific* investment offering that must be "more than a less expensive alternative fund with some similarity." *Meiners*, 898 F.3d at 823-24; *Davis*, 960 F.3d at 486; *Kong v. Trader Joe's Co.* ("*Kong I*"), 2020 WL 5814102, at *4 (C.D. Cal. Sept. 24, 2020).

The Complaint here offers nothing of the sort. Instead, it puts forward two flimsy tables that compare the expense ratios of the six challenged funds to the "median" and "average" expense ratios for funds in their investment category in general, according to a single study conducted by the Investment Company Institute ("ICI Study"). But "median" or "average" fees are not meaningful benchmarks, as numerous courts have held. *See Kendall*, 2021 WL 1231415, at *7 ("Plaintiffs do not compare sufficiently similar funds …. A median value for an entire category cannot be said to be identical save for price."). In turn, "[m]erely arguing that … the Plan's

20

investment options are above the median for their investment category does not plausibly suggest a breach." *Id.*; *see also CommonSpirit Health*, 2021 WL 4097052, at *10 ("Plaintiff's sole allegation that the total amount of investment management fees paid was higher than average is insufficient to plead a claim that Defendants violated the fiduciary duty of prudence.").

The reason courts reject reliance on median or average fees to infer imprudence is simple. If that were the test, every single investment option with fees above their category's median—by definition, *half of all investment options*—would be deemed imprudent. *See Obeslo v. Great-W. Capital Mgmt., LLC*, 2020 WL 4558982, at *7 n.4, (D. Colo. 2020) (observing that the mere fact that a given mutual fund has higher expenses than "industry average fees" does not render the fees excessive; if that were the case, half of all mutual funds would have 'excessive' fees'"), *aff'd*, 6 F.4th 1135 (10th Cir. 2021). *See, e.g., Perkins*, No. 3:21-cv-00973, at *15 (holding ICI averages and medians were insufficient benchmarks); *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *2 n.3 (N.D. Cal. Oct. 5, 2020) (refusing to rely on the ICI Study and explaining that it lumps together too many disparate investments); *see also Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1306-07 (D. Minn. 2021); *Rosenkranz v. Altru Health Sys.*, 2021 WL 5868960, at *10 (D.N.D. Dec. 10, 2021); *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *8 (N.D. Cal. Feb. 9, 2021); *Commonspirit Health*, 2021 WL 4097052, at *9.

This is not surprising considering that the ICI Study itself explains that "[t]his material is *not intended for benchmarking the costs of specific plans* to the broad averages presented here." ICI Study at Introduction (emphasis added).  In turn, courts recognize that the ICI Study's fund categories include a wide amalgamation of funds that do not differentiate between passively and actively managed funds, and do not address asset allocation or risk among the different funds that are grouped together.  In other words, they do not offer a meaningful benchmark. *Salesforce.com*,

2020 WL 5893405, at *2 n.3; *Parmer*, 518 F. Supp. 3d at 1306-07; *Rosenkranz*, 2021 WL 5868960, at *10; *Wehner*, 2021 WL 507599, at *8; *Commonspirit Health*, 2021 WL 4097052, at *9.  This Court should hold the same.

### D.      The Complaint's Derivative Failure-to-Monitor Claim Likewise Fails

Count II of the Complaint alleges that Deloitte failed to monitor the Plans' Committee and other fiduciaries with respect to the Plans' investments and recordkeeping fees.  Compl. ¶¶ 94-100.  This claim fails along with the Complaint's primary fiduciary-breach claim because a failure-to-monitor claim under ERISA is a derivative theory of liability.  *See, e.g.*, *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 602, 614 (D. Md. 2010) (dismissing failure-to-monitor claim as "derivative," as such a claim does "not provide independent grounds for relief, but rather depend[s] upon the establishment of an underlying breach of fiduciary duty cognizable under ERISA"); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 795 (W.D.N.C. 2003) (similar).  Thus, because Count I of the Complaint fails as deficient and implausible, so, too, does Count II.

## IV.      CONCLUSION

Deloitte respectfully requests that the Court grant its Motion and dismiss the Complaint in its entirety and with prejudice.

Dated:  March 18, 2022                            Respectfully submitted,

*/s/ Brian T. Ortelere*
Brian T. Ortelere
Jared R. Killeen
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:     +1.215.963.5917
Facsimile:      +1.215.963.5001
brian.ortelere@morganlewis.com
jared.killeen@morganlewis.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Brian T. Ortelere, an attorney, hereby certify that the Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint complies with the type-volume limitation pursuant to § II.D of the Individual Practices of Judge John G. Koeltl.  The brief contains 6,980 words of Times New Roman 12-point proportional type.

*/s/ Brian T. Ortelere*
Brian T. Ortelere

**<u>CERTIFICATE OF SERVICE</u>**

I, Brian T. Ortelere, an attorney, hereby certify that on March 18, 2022, I electronically

filed copies of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss

the Complaint through the Court's CM/ECF system, which will send notification of such filing to

all counsel of record.

*/s/ Brian T. Ortelere*
Brian T. Ortelere
