UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------

RUPINDER SINGH, ET AL.,

                    Plaintiffs,

          - against -

DELOITTE LLP, ET AL.,

                    Defendants.

------------------------------

21-cv-8458 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs, Rupinder Singh, Jeffrey Popkin, Joni
Walker, and Jenny Mark brought this putative class action
against the defendants Deloitte LLP ("Deloitte"), the Board of
Directors of Deloitte LLP (the "Board"), and the Retirement Plan
Committee of Deloitte LLP (the "Committee") alleging a breach of
the fiduciary duty of prudence in violation of the Employment
Retirement Income Security Act ("ERISA"), 29 U.S.C. 1001, et
seq.

The defendants now move to dismiss various claims for lack
of subject matter jurisdiction pursuant to Federal Rule of Civil
Procedure 12(b)(1) and for failure to state a claim pursuant to
Federal Rule of Civil Procedure 12(b)(6). For the following
reasons, the defendants' motion to dismiss is **granted.**

                              I.

The following facts are taken from the Complaint, ECF No.
1, unless otherwise noted. The plaintiffs were employed by the

defendant, Deloitte, an "audit, consulting, tax, and advisory services" firm. Compl. ¶ 23. The defendants offered two retirement plans (the "Plans"): the 401(k) Plan and the Profit Sharing Plan ("PSP"). The Plans were administered by the Committee, which was appointed by the Board to be the "fiduciary" of the Plans and had "the authority to control and manage the operation and administration of" the Plans. Id. ¶ 30. The plaintiffs allege that the Committee's role was to "ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers." Id. The plaintiffs further allege that "the Committee fell well short of these fiduciary goals." Id.

The Plans are defined-contribution retirement plans. Defined-contribution plans provide that the "retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account," based on the amount of an individual's contribution to their account. Id. ¶ 42. The 401(k) Plan was available to "regular full-time employees who are not designated as partners, principals or managing directors." The PSP was "limited to all Principals and Partners (collectively 'Partners') and Managing Directors ('Directors') who meet the eligibility requirements of the [PSP]." Id. ¶ 43. Each of the individual plaintiffs invested in the 401(k) Plan. None of them

participated, or were eligible for, the PSP. The plaintiffs
allege that "both Plans are managed in an identical fashion,
have identical sponsors, recordkeepers, administrators,
managers, and have identical Trustees." Id. ¶ 21. The Plans
allowed for participants to contribute in several different
ways, and Deloitte would match these contributions up to a
certain percentage. See id. ¶¶ 44-48. The Plans managed a
substantial amount of assets, with each having over $7 billion
dollars in assets under management, qualifying them as "jumbo
plans" and among the largest plans in the United States. Id. ¶
9-10, 52. The plaintiffs allege that, "as jumbo plans, the Plans
had substantial bargaining power regarding the fees and expenses
that were charged against participants' investments." Id. ¶ 10.

  "Recordkeeping" refers to "the suite of administrative
services typically provided to a defined contribution plan by
the plan's 'recordkeeper.'" Id. ¶ 58. Recordkeeping services are
not free, and expenses associated with recordkeeping "can either
be paid directly from plan assets, or indirectly by the plan's
investments in a practice known as revenue sharing." Id. ¶ 59.
The price for recordkeeping "depends on the number of
participants" in a plan, "not on the amount of assets in the
participant's account." Id. ¶ 61. The plaintiffs allege that
"prudent fiduciaries negotiate a fixed dollar amount for the
recordkeeper's annual compensation, usually based on a rate of a

fixed dollar amount per participant rather than as a percentage of assets," and that "[b]ecause of economies of scale, large plans get lower effective rates per participant than smaller plans." Id.

The plaintiffs allege that the recordkeeping costs for the Plans were higher than comparable peer plans. From 2015 to 2019, the 401(k) Plan's recordkeeping cost per participant ranged from $59.58 to $70.31, and the PSP's recordkeeping cost per participant ranged from $221.29 to $331.01. Id. ¶ 63. The recordkeeper for the Plans during this period was Vanguard. Id. ¶ 62. The plaintiffs compare these figures to other plans with at least 30,000 participants, for which the recordkeeping cost per participant ranged from $21 to $34. Id. ¶ 66. The recordkeeping costs for the comparator plans that also had Vanguard serving as their recordkeeper ranged from $27 to $33. Id.

The plaintiffs allege that part of a fiduciary's duty to remain informed about overall trends in the recordkeeping fee marketplace includes conducting a Request for Proposal ("RFP") process at "reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace." Id. ¶ 71. The plaintiffs allege that, because the Plans kept Vanguard as recordkeeper and "paid outrageous amounts for recordkeeping from

2015 to 2017," there is "little to suggest" that Deloitte conducted an RFP at reasonable intervals, "or certainly at any time prior to 2015 through the present." Id. ¶ 72.

In addition to the recordkeeping costs, each of the funds offered by the Plans has an associated management cost for "investment management and other services." Id. ¶ 78. This fee is referred to as the "expense ratio," and is the amount paid by a plan's participant relative to the percentage of assets held by that participant in the fund. Id. For example, an expense ratio of 0.75% means that a plan participant will pay $7.50 for every $1,000 in assets. The plaintiff alleges that jumbo plans "are able to qualify for lower fees on a per participant basis." Id. ¶ 80.

The plaintiffs identify six funds offered by the Plans that they allege had "excessively high" expense ratios. Id. ¶ 84. The funds, and their associated ratios, are as follows:

> T. Rowe Price Emerging Markets Equity Trust B: 0.80%
> T. Rowe Price In'l Small Cap Equity Trust C: 0.85%
> T. Rowe Price Real Estate Fund: 0.78%
> T. Rowe Price Inst. Emerging Markets Bond Fund: 0.70%
> T. Rowe Price Spectrum Mod GR Allc Fund: 0.89%
> Vanguard Explorer Value Fund: 0.55%

Id. The plaintiffs compare these funds to median and average costs of funds according to a study conducted by the Investment Company Institute ("ICI"), and the plaintiffs argue that the expense ratios for these funds are "excessively high" when

compared to the ICI Medians and ICI Averages. See id. ¶¶ 84-85.
The plaintiffs allege that these costs, in addition to the
recordkeeping costs of the Plans, are "indirect evidence" that
the Plans were managed imprudently. Id. ¶ 86.

The plaintiffs allege only that Popkin invested in one of
the challenged funds, the T. Rowe Price Real Estate Fund. Id.
¶ 18. The defendants note in a separate declaration that Popkin
also invested in the T. Rowe Price Emerging Markets Equity Trust
B. Aeder Decl., ECF No. 34, ¶ 3. No other plaintiff has alleged
any investment into the other remaining challenged funds.

The plaintiffs claim that, in managing the Plans, the
defendants breached their fiduciary duty of prudence as required
by ERISA. The plaintiffs seek compensatory damages, recovery of
any lost profits, an injunction against the defendants for any
further ERISA violations, and attorney's fees.

## II.

### A.

When presented with motions under Rule 12(b)(1) to dismiss
for lack of subject matter jurisdiction and Rule 12(b)(6) to
dismiss for failure to state a claim upon which relief can be
granted, the Court should consider the jurisdictional challenge

first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896

F.2d 674, 678 (2d Cir. 1990).[1]

The defendants first move to dismiss various claims for

lack of subject-matter jurisdiction, arguing that the plaintiffs

lack standing to bring claims relating to the PSP and to four of

the six funds in the 401(k) Plan because the plaintiffs have not

alleged participation in either the PSP or those four funds in

the 401(k) Plan. To prevail against a motion to dismiss for lack

of subject matter jurisdiction, the plaintiff bears the burden

of proving the Court's jurisdiction by a preponderance of the

evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir.

2000). In considering such a motion, the Court generally must

accept the material factual allegations in the complaint as

true. See J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107,

110 (2d Cir. 2004). However, the Court does not draw all

reasonable inferences in the plaintiff's favor. Id. Indeed,

where jurisdictional facts are disputed, the Court has the power

and the obligation to consider matters outside the pleadings to

determine whether jurisdiction exists. See Kamen v. Am. Tel. &

Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the

---

[1] Unless otherwise noted, this Memorandum Opinion and Order
omits all internal alterations, citations, footnotes, and
quotation marks in quoted text.

Court is guided by that body of decisional law that has developed under Rule 56. See id.

Article III standing requires a party to show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

**B.**

The defendants argue that the plaintiffs lack standing with respect to the claims involving the PSP because none of the plaintiffs participated in the PSP. ERISA creates a cause of action for violation of fiduciary duties to be brought by "a participant, beneficiary, or fiduciary" of a particular plan. 29 U.S.C. § 1132(a)(2); see also LaRue v. DeWolff, Boberg & Assocs., Inc., 552 U.S. 248, 251 (2008) ("[29 U.S.C § 1132(a)(2)] provides for suits to enforce the liability-creating provisions of [29 U.S.C § 1109], concerning breaches of fiduciary duties that harm plans.").

The plaintiffs have not alleged any involvement in the PSP because none of them have invested in the PSP. Consequently, they are not participants, beneficiaries, or fiduciaries of that

Plan within the meaning of ERISA. See Dezelan v. Voya Ret. Ins. & Annuity Co., No. 16-cv-1251, 2017 WL 2909714, at *6 (D. Conn. July 6, 2017) (collecting cases). Accordingly, the plaintiffs lack standing with respect to the PSP because none of the plaintiffs have alleged participation in that Plan.

### C.

The plaintiffs also lack standing with respect to their claims involving four of the six challenged funds in the 401(k) Plan because the plaintiffs only invested in two of those six challenged funds. Injury-in-fact requires the plaintiffs to show that they have suffered an actual or imminent injury that is concrete and particularized as to the plaintiffs. The 401(k) Plan is a defined-contribution plan. A defined-contribution plan is a retirement plan in which a plan participant's benefit is determined entirely by that participant's individual contributions to their own plan and in which the participants direct the investment of their contributions into various investment options offered by the plan. It follows, then, that a plan participant who does not invest their plan assets into a particular fund offered in a defined-contribution plan will not have their individual plan benefit affected in any way by that fund's performance or associated fees. Because the plaintiffs here did not invest in four of the six challenged funds, the "allegedly poor performance of those specific products" could

not have affected the "individual account of any of the named
plaintiffs." In re Omnicom ERISA Litigation, No. 20-cv-4141,
2021 WL 3292487, at *9 (S.D.N.Y. Aug. 2, 2021). Accordingly,
none of the plaintiffs have shown that the four challenged funds
in which they did not invest caused them any particularized
injury, and therefore lack standing to bring their claims
against those four funds. See Taveras v. UBS AG, 612 F. App'x
27, 29 (2d Cir. 2015); Patterson v. Morgan Stanley, No. 16-cv-
6568, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019).

### III.

### A.

That leaves the defendants' Rule 12(b)(6) motion to dismiss
the claims relating to the two remaining challenged funds. In
deciding a motion to dismiss pursuant to Rule 12(b)(6), the
allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiffs' favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007). The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985). The Court should not dismiss the complaint if the
plaintiff has stated "enough facts to state a claim to relief
that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## B.

To state a claim for breach of fiduciary duty under ERISA, the plaintiff must allege that "(1) the defendant was a fiduciary who (2) was acting in a fiduciary capacity, and (3) breached his fiduciary duty." Cunningham v. USI Ins. Servs., LLC, No. 21-cv-1819, 2022 WL 889164, at *2 (S.D.N.Y. Mar. 25, 2022). The defendants do not dispute that they were fiduciaries of the Plans acting in their fiduciary capacity. The defendants

claim only that they did not breach their fiduciary duty of prudence to the plaintiffs.

ERISA imposes a duty of prudence upon plan fiduciaries, directing them to make reasonable investment and managerial decisions "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). The duty of prudence "is measured according to the objective prudent person standard developed in the common law of trusts," and a fiduciary's actions are judged "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." Pension Benefit Guar. Corp. ex rel. Saint Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 716 (2d Cir. 2013). The focus is "on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." Id. "In other words, courts analyze a fiduciary's process to determine prudence, not outcome." Ferguson v. Ruane Cunniff & Goldfarb Inc., No. 17-cv-6685, 2019 WL 4466714, at *5 (S.D.N.Y. Sep. 18, 2019). Trust law informs the duty of prudence, because "an ERISA fiduciary's duty is derived from the common law of trusts." Tibble v. Edison Int'l, 575 U.S. 523, 528

(2015). Because ERISA's duty of prudence is interpreted according to the common law of trusts, "a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." Id. at 530. The analysis is "context specific," giving "due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." Hughes v. Nw. Univ., 142 S. Ct. 737, 742 (2022).

C.

First, the plaintiffs allege that the recordkeeping fees charged by the 401(k) Plan were unreasonably excessive, indicating that the Plan was managed imprudently. From 2015 to 2019, the 401(k) Plan charged recordkeeping fees per-participant in the range of $59.58 to $70.31. Compl. ¶ 63. Two comparable plans administered by the same recordkeeper, Vanguard, allegedly charged $27 and $33 in recordkeeping fees per participant. Id. ¶ 66. The plaintiffs compare these fee ranges to claim that the 401(k) Plan fees were "astronomical" and that the Plan "should have been able to negotiate a recordkeeping cost in the low $20 range." Id. ¶¶ 64, 66. Because the 401(k) Plan's recordkeeping fees were higher than these comparable plans, the plaintiffs argue that the defendants' "lack of a prudent process to monitor the Plans' fees is evident." Id. ¶ 74.

However, the plaintiffs must allege more than just that the 401(k) Plan's recordkeeping fees were higher than those of other

plans. Well-reasoned decisions in this Circuit have found that plaintiffs must plausibly allege that "the administrative fees were excessive relative to the services rendered." Ferguson, 2019 WL 4466714, at *8; Gonzalez v. Northwell Health, No. 20-cv-3256, 2022 WL 4639673, at *10 (E.D.N.Y. Sep. 30, 2022) ("A plaintiff must plead administrative fees that are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue."); see also Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th Cir. 2022) (same).

Here, the plaintiffs have not done so. The plaintiffs allege that "[n]early all recordkeepers in the marketplace offer the same range of services." Compl. ¶ 58. Accepting this as true, the plaintiffs still do not allege, with specificity, what recordkeeping services the 401(k) Plan received from Vanguard. Even further, they have not alleged what recordkeeping services the comparator plans received from Vanguard. The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range. And "paying higher-fees alone does not allow the Court to conclude that the fees were excessive enough to prove [the defendants'] imprudence." Ferguson, 2019 WL 4466714, at *7-8.[2]

_____

[2] Ferguson refers to these fees as "administrative fees," but it is clear that the "administrative fees" referred to

Moreover, the plaintiffs' comparison is disingenuous because it compares the combined direct and indirect costs of the 401(k) Plan to only the direct costs of the comparator plans. Compare, e.g., Compl. ¶ 66 (claiming that the recordkeeping costs per-participant for the WPP Group Plan is $27, and total recordkeeping costs of $977,116), with Form 5500 for the WPP Group Plan, Sch. C, ECF No. 33-25 (reporting that Vanguard received "direct compensation" of $977,116 rather than total compensation, and that Vanguard received "indirect compensation" of an undisclosed amount).[3] This comparison is plainly inapposite and "provides little insight" into whether the total recordkeeping fees paid by the plaintiffs are higher than the total recordkeeping fees paid by participants in the comparator plans. Gonzalez, 2022 WL 4639673, at *10. Because the plaintiffs' comparison does not compare apples to apples, the comparison fails to indicate plausibly imprudence on the part of the defendants.

---

include, or are coextensive with, the cost of recordkeeping services. See 2019 WL 4466714, at *7 (discussing the plaintiffs' allegation that "the cost of recordkeeping under the plan swelled out of proportion to actual recordkeeping services").

[3] The plaintiffs reference Form 5500 information in their complaint. Compl. ¶ 66 n.8. The document may therefore be considered on this motion to dismiss because it is incorporated by reference in the complaint. See Chambers, 282 F.3d at 152-53.

**D.**

The plaintiffs also allege that the 401(k) Plan was managed imprudently because the expense ratios charged by the offered funds were excessive. The plaintiffs compare the cost of the two funds to aggregate medians and averages offered by the ICI. The T. Rowe Price Emerging Markets Equity Trust B had an expense ratio of 0.80% as compared to the ICI Median of 0.50%, and the T. Rowe Price Real Estate Fund had an expense ratio of 0.78% as compared to the ICI Median of 0.30%. Compl. ¶ 84. The plaintiffs also compared these two funds to the ICI Average expense ratios that were 0.49% and 0.34%, respectively. Id. ¶ 85. Citing these numbers, the plaintiffs claim that the defendants "could not have engaged in a prudent process as it relates to evaluating investment management fees" because of the "excessively high expense ratios" charged by the funds. Id. ¶¶ 83, 84. The plaintiffs also claim that "[f]ailure to select funds that cost no more than the average expense ratios for similar funds in similarly-sized plans cost Plan Participants millions of dollars." Id. ¶ 86.

The plaintiffs' argument that the funds' expense ratios were unreasonably high as compared to an arbitrary benchmark is duplicative of their recordkeeping fee argument and fails for similar reasons. The plaintiffs do not allege why the two funds they challenge are comparable to the ICI Medians and Averages,

16

nor do they offer details for any other comparable funds. The plaintiffs' only metric of comparison is the "average fees of funds in similarly-sized plans." Compl. ¶¶ 84-85.   But this metric does not allow for comparison because the plaintiffs do not specify the details of the funds captured in the aggregate by the ICI Medians and Averages. In effect, the plaintiffs have only alleged that some funds in the world are more expensive than other funds. This allegation, alone, does not plead sufficiently that the 401(k) Plan fiduciaries imprudently managed the Plan. See Patterson, 2019 WL 4934834, at *12 ("The existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice.").

Moreover, the mere fact that a fund charges an expense ratio higher than the mean or median, in and of itself, does not imply that the cost was excessive. Otherwise, by definition, half of all funds would charge excessive fees. Whether a fiduciary has breached its duty of prudence requires a "context-specific" inquiry. Hughes, 142 S. Ct. at 742. Hughes clarified the holding in Tibble by stating that "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." Id. Thus, "[i]f the

17

fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty."[4]

The plaintiffs here do not offer any additional context beyond their allegation that the two challenged funds had higher expense ratios as compared to arbitrary third-party median values.[5] The plaintiffs do not allege, for example, that the two funds underperformed relative to other comparable funds with similar or lower expense ratios, which would provide meaningful context from which to determine whether a fiduciary acted prudently. See, e.g., Gonzalez, 2022 WL 4639673, at *8 ("This is not the type of substantial underperformance over a lengthy period that gives rise to a plausible inference that a prudent fiduciary would have removed these funds from the plan's menu of

---

[4] The Hughes Court focused its analysis on whether the presence of investor choice in a defined-contribution plan relaxed an ERISA fiduciary's duty of prudence to manage the investments available in that plan. Hughes concluded that an "exclusive focus on investor choice" did not relax a fiduciary's duty of prudence. Hughes, 142 S. Ct. at 742; see also Albert v. Oshkosh Corp., 47 F.4th 570, 580 (7th Cir. 2022) ("Hughes merely rejected [the Court of Appeals for the Seventh Circuit's] assumption that the availability of a mix of high-cost and low-cost investment options in a plan insulated fiduciaries from liability."). In this case, neither party has alleged that the presence of investor choice relaxed the defendants' duty of prudence.

[5] Courts outside of this Circuit have also found that the ICI Median is not an appropriate benchmark because it fails to distinguish between passively and actively managed funds, and therefore aggregates disparate investments. See, e.g., Perkins v. United Surgical Partners Int'l, Inc., No. 21-cv-973, 2022 WL 824839, at *6 n.41 (N.D. Tex. Mar. 18, 2022) (collecting cases).

options."); see also Ferguson, 2019 WL 4466714, at *5-6
(declining to find a breach of the duty of prudence even though
plaintiffs alleged that the "there were alternative, available
share classes for which the Plan was eligible, and which would
have resulted in significantly lower costs to the Plan for the
exact same investments"). Instead, the plaintiffs allege only
that the funds offered to them by the 401(k) Plan were more
expensive than other funds. Without pleading facts indicating
additional indicia of imprudence, the plaintiffs have not
alleged plausibly that the plan fiduciaries breached their duty
of prudence. Accordingly, the defendants' motion to dismiss the
claim of fiduciary breach is **granted.**

**IV.**

The plaintiffs also bring a claim for a failure to monitor.
Both parties agree that this claim is derivative of the
plaintiffs' claim of a breach of fiduciary duty. Because the
plaintiffs have insufficiently pleaded their claim for a breach
of fiduciary duty, the defendants' motion to dismiss the
derivative claim for failure to monitor is likewise **granted.** See
Coulter v. Morgan Stanley & Co., 753 F.3d 361, 368 (2d Cir.
2014) (finding that failure to monitor claims "cannot survive
absent a viable claim for breach of a duty of prudence").

**CONCLUSION**

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss is **granted**. The complaint is dismissed without prejudice to the ability of the plaintiffs to move to file an amended complaint. Any such motion must be filed within thirty days of the date of this Memorandum Opinion and Order and explain how any proposed amended complaint would resolve the defects in the current complaint. The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:     New York, New York
           January 12, 2023

                                        John G. Koeltl
                              United States District Judge