EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RUPINDER SINGH, JEFFREY S. POPKIN, JONI WALKER and JENNY MARK, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>DELOITTE, LLP, THE BOARD OF DIRECTORS OF DELOITTE, LLP, THE RETIREMENT COMMITTEE OF DELOITTE, LLP and JOHN DOES 1-30.<br><br>          Defendants. | **CIVIL ACTION NO.:**<br><br>**1:21-cv-08458-JGK** |

**FIRST AMENDED COMPLAINT**

Plaintiffs, Rupinder Singh, Jeffrey S. Popkin, Joni Walker and Jenny Mark ("Plaintiffs"), by and through their attorneys, on behalf of the Deloitte 401(k) Plan (the "Plan"),("401(k) Plan") and the Deloitte Profit Sharing Plan ("PSP Plan") with the 401(K) Plan and the PSP Plan being referred to collectively as the Plans,[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan'sPlans' fiduciaries, which include Deloitte, LLP ("Deloitte" or "Company") and the Board

---

[1]  The Plan is aPlans are legal entityentities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan isPlans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the PlanPlans and itstheir participants.

of Directors of Deloitte, LLP and its members during the Class Period[2] ("Board") and the Retirement Committee of Deloitte, LLP and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.      To safeguard planPlans' participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 Fed.Appx. 24 (2d Cir. 2016).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[2] The Class Period, as will be discussed in more detail below, is defined as October 13, 2015 through the date of judgment.

2

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      The Supreme Court recently reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

8.      Because cost-conscious management is fundamental to prudence in the investment function, the concept applies to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees.

7.      Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement. Although at all times plan accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

8. ~~Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their retirement plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.~~

9. At all times during the Class Period, the ~~401(k)~~ Plan had at least $4.2 billion dollars in assets under management.  At the end of fiscal year 2020 and 2019, the ~~401(k)~~ Plan had over $7.3 billion dollars and $6.5 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The May 30, 2020 Report of Independent Auditor of the Deloitte 401(k) Plan ("2020 401(k) Auditor Report") at 3. ~~At all times during the Class Period, the PSP Plan had at least $4.8 billion dollars in assets under management.  At the end of 2020 and 2019, the PSP Plan had over $7.2 billion dollars and $6.7 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The May 30, 2020 Report of Independent Auditor of the Deloitte Profit Sharing Plan ("2020 PSP Auditor Report") at 3.~~

10. The Plan's~~Plans'~~ assets under management qualifies it~~them~~ as a jumbo plan~~plans~~ in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan~~plans~~, the Plan~~Plans~~ had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

11. The Plan is also large in terms of~~Defendants, however, did not try to reduce~~ the number of its participants.  From 2015 to 2019, for example, the Plan had between 62,114 and 81,639 participants with account balances. For comparison, according~~Plans' expenses or exercise appropriate judgment~~ to information derived from ERISApedia.com's database, a service~~scrutinize each investment option~~ that compiles all Form 5500s filed with the Dept. of Labor ("DOL") by retirement plans, in 2020, there ~~was offered in the Plans to ensure they~~ were

4

only 125 defined contribution plans (401k, 401a, and 403b) in the country with over 50,000 participants with account balances.

12.    In addition to the Plan, Deloitte also offers the Deloitte Profit Sharing Plan ("PSP Plan"). prudent. The PSP Plan "is a defined contribution profit sharing plan established to cover all Principals and Partners (collectively "Partners") and Managing Directors ("Directors") who meet the eligibility requirements of the Plan." The PSP Plan 2020 Auditor Report at 5.

13.    The PSP is relevant to this litigation in as much as Defendants could have leveraged the number of participants in the PSP to obtain a lower recordkeeping fee for the Plan. *See* Declaration of Francis M. Vitagliano, attached hereto as Ex. 1, at ¶46 (opining that "for purposes of negotiating a reasonable recordkeeping fee with a record keeper, a plan sponsor should ask the recordkeeper to combine and consider the total number of plan participants with account balances in all the plans sponsored by a company."). During the Class Period, the number of participants in the PSP Plan ranged from 6,492 in 2015 to 7,388 in 2019. Where applicable herein, both the Plan and PSP Plan will be referred to collectively, as the "Plans."

10.14. Accordingly, the Plan had substantial bargaining power to negotiate favorable recordkeeping and administration fees. *See* Vitagliano Decl. ¶23 (opining that "plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.")

11.15. Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the PlanPlans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by, *inter alia*, failing to control the Plans' administrative and recordkeeping ("RKA") costs.

12.16. Defendants' mismanagement of the PlanPlans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. §

1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan~~Plans~~ and its participants millions of dollars.

~~13.~~17.  Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.  JURISDICTION AND VENUE

~~14.~~18.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

~~15.~~19.  This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

~~16.~~20.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.  PARTIES

**Plaintiffs**

~~17.~~21.  Plaintiff, Rupinder Singh ("Singh"), resides in Miami, Florida. During her employment, Plaintiff Singh participated in the 401(k) Plan ~~investing in the options offered by the 401(k) Plan that are at issue in this action and~~ paying the RKA~~recordkeeping and administrative~~ costs associated with her Plan account and was subject to the excessive RKA costs.~~.~~ Ms. Singh suffered injury to her Plan account by overpaying~~invested in the 401(k) Plan, but both Plans are~~

6

managed in an identical fashion, have identical administrators, a nearly identical menu of funds for her share of RKA costsinvestment, sponsors, managers and have identical Trustees.

18.22. Plaintiff, Jeffrey S. Popkin ("Popkin"), resides in Bethesda, Maryland. During his employment, Plaintiff Popkin participated in the 401(k) Plan investing in the options offered by the 401(k) Plan that are at issue in this action and paying the recordkeeping and administrative costs associated with his Plan account. In fact, Mr. Popkin invested in several options offered by the 401(k) Plan, but, in particular, Mr. Popkin invested in the T. Rowe Price Real Estate fund which, as will be discussed below in Section C, had unreasonably high expenses as compared to similar funds found in peer plans of equal size. Mr. Plan paying the RKA costs associated with his Plan account and was subject to the excessive RKA costs. Mr. Popkin suffered injury to his Plan account by overpaying for his share of RKA costs.Popkin invested in the 401(k) Plan, but both Plans are managed in an identical fashion, have identical administrators, a nearly identical menu of funds for investment, sponsors, managers and have identical Trustees.

19.23. Plaintiff, Joni Walker ("Walker"), resides in Irvine, California. During her employment, Plaintiff Walker participated in the 401(k) Plan investing in the options offered by the 401(k) Plan that are at issue in this action and paying the RKArecordkeeping and administrative costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Walker suffered injury to her Plan account by overpayinginvested in the 401(k) Plan, but both Plans are managed in an identical fashion, have identical administrators, a nearly identical menu of funds for her share of RKA costsinvestment, sponsors, managers and have identical Trustees.

20.24. Plaintiff, Jenny Mark ("Mark"), resides in Somerset, Massachusetts. During her employment, Plaintiff Mark participated in the 401(k) Plan investing in the options offered by the 401(k) Plan that are at issue in this action and paying the RKArecordkeeping and administrative costs associated with her Plan account and was subject to the excessive RKA costs. Ms. Mark suffered injury to her Plan account by overpayinginvested in the 401(k) Plan, but both Plans are

7

~~managed in an identical fashion, have identical administrators, a nearly identical menu of funds~~ for <u>her share of RKA costs</u>~~investment, a nearly identical menu of funds for investment, sponsors, managers and have identical Trustees~~.

~~21.~~<u>25.</u>  Plaintiffs have standing to bring this action on behalf of the <u>Plan</u>~~Plans~~ because they participated in the ~~401(k)~~ Plan and were injured by Defendants' unlawful conduct. ~~Plaintiffs invested in the 401(k) Plan, but both Plans are managed in an identical fashion, have identical sponsors, recordkeepers, administrators, managers and have identical Trustees.~~  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

~~22.~~<u>26.</u>  Plaintiffs did not have knowledge of all material facts (including, among other things, total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

~~23.~~<u>27.</u>  Deloitte is the sponsor of the <u>Plan</u>~~Plans~~ and a named fiduciary of both the 401(k) Plan and the PSP Plan with a principal place of business being 30 Rockefeller Plaza, New York, New York. The May 30, 2020 Form 5500 of the Deloitte 401(k) Plan filed with the United States Department of Labor ("2020 401(k) Form 5500") at 1 and The May 30, 2020 Form 5500 of the Deloitte Profit Sharing Plan filed with the United States Department of Labor ("2020 PSP Form 5500") at 1. Deloitte describes itself as an "industry-leading audit, consulting, tax, and advisory

services to many of the world's most admired brands, including nearly 90 percent of the Fortune 500® and more than 5,000 private and middle-market companies."[4]

24.28.  Deloitte appointed the Retirement Committee of Deloitte, LLC ("Committee") to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. The Master Trust Agreement between Deloitte, LLC and Vanguard Fiduciary Trust Company dated August 31, 2004 ("Master Trust") at 1. As detailed in the Master Trust, the Committee "is the fiduciary named in the Participating Plans as having the authority to control and manage the operation and administration of the Participating Plans … ." *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.29.  Accordingly, Deloitte during the putative Class Period is/was a fiduciary of the PlanPlans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

26.30.  For the foregoing reasons, the Company is a fiduciary of the PlanPlans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

27.31.  Deloitte, acting through its Board of Directors, appointed the Retirement Committee of Deloitte, LLC ("Committee") to act as a fiduciary of, among other things, ensure that the Plan. investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Master Trust at 1. As detailed in the Master Trust, the Committee "is the fiduciary named in the Participating Plans as having the authority to control and manage the operation and administration of the Participating

---

[4] https://www2.deloitte.com last accessed on October 5, 2021.

9

Plans …" *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

28.32.  Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the PlanPlans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

29.33. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

30.34.  AsA discussed above, Deloitte and the Board appointed the Committee to, among other things, ensure that the investments available to both Plans' participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. Master Trust at 1. As detailed in the Master Trust, the Committee "is the fiduciary named in the Participating Plans as having the authority to control and manage the operation and administration of the Participating Plans …" *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, individuals or entities that exercise discretionary authority over management or disposition of planthe Plans assets are considered fiduciaries.

31.35.  The Committee and each of its members were fiduciaries of the PlanPlans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of the PlanPlans assets.

32.36.  The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

33.37.  To the extent that there are additional officers, employees and/or contractors of Deloitte who are/were fiduciaries of the PlanPlans during the Class Period, or were hired as investment manager(s) for the PlanPlans during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Deloitte officers, employees and/or contractors who are/were fiduciaries of the PlanPlans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**IV.   CLASS ACTION ALLEGATIONS**

34.38.  Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the PlanPlans, at any time between October 13, 2015 through the date of judgment (the "Class Period").

35.39.  The members of the Class are so numerous that joinder of all members is impractical.  The 2020 401(k) Form 5500 lists 81,639 Plan "participants with account balances as of the end of the plan year."  2020 401(k) Form 5500 at 2.  The 2020 PSP Form 5500 lists 7,388 Plan "participants with account balances as of the end of the plan year."  2020 TSA Form 5500 at 2.

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

36.40.  Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan~~Plans~~ and have suffered injuries as a result of Defendants' mismanagement of the Plan~~Plans~~. Defendants treated the Plaintiffs consistently with other Class members and managed the Plan~~Plans~~ as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

37.41.  There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.      Whether Defendants are/were fiduciaries of the Plan~~Plans~~;

B.      Whether Defendants breached their fiduciary duties of ~~loyalty and~~ prudence by engaging in the conduct described herein;

C.      Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was~~Plans were~~ being managed in compliance with ERISA;

D.      The proper form of equitable and injunctive relief; and

E.      The proper measure of monetary relief.

38.42.  Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

39.43.  This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the

12

members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

40.44. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### V.    THE PLANPLANS

41.45. The Plan is aPlans are "defined contribution" planplans within the meaning of ERISA Section 3(34), 29 U.S.C. §1002(34). The 401(k) Plan "is a defined contribution plan and is sponsored by Deloitte LLP ('Deloitte') and its subsidiaries (collectively the 'U.S. Firms')." The 401(k) Plan 2020 Auditor Report at 5. The PSP Plan "is a defined contribution profit sharing plan established to cover all Principals and Partners (collectively "Partners") and Managing Directors ("Directors") who meet the eligibility requirements of the Plan." The PSPThe 401(k) Plan 2020 Auditor Report at 5.

42.46. The Plan is aPlans are "defined contribution" or "individual account" planplans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan providesPlans provide for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. The 2020 401(k) Plan Auditor Report at 5. and the 2020 PSP Auditor Report at 5. Consequently, retirement benefits

13

provided by the Plan is~~Plans are~~ based solely on the amounts allocated to each individual's account. *Id.*

### *Eligibility*

43.47. In general, regular full-time employees who are not designated as partners, principals or managing directors are eligible to participate in the 401(k) Plan. The 2020 401(k) Plan Auditor Report at 5. ~~The PSP Plan is "limited to all Principals and Partners (collectively "Partners") and Managing Directors ("Directors") who meet the eligibility requirements of the Plan." The 2020 PSP Plan Auditor Report at 5.~~

### *Contributions*

44.48. With regard to the 401(k) Plan, there are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit-sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. The 2020 401(k) Plan Auditor Report at 5. With regard to the PSP Plan, Deloitte makes "age-based contributions as a percentage of compensation on behalf of each eligible Director each Plan year." The 2020 PSP Plan Auditor Report at 5. No other contributions are made by Deloitte or by the eligible employees of the PSP Plan. *Id.*

45.49. With regard to employee contributions in the 401(k) Plan: "[e]ach participant may contribute to the Plan any whole percentage of his or her compensation from 1% to 60% on a pre-tax basis or after-tax Roth basis, up to the calendar year maximum contribution allowed by the Internal Revenue Code." 2020 401(k) Plan Auditor Report at 5. Deloitte will make matching contributions to the 401(k) Plan on behalf of its employees "equal to 25% of each participant's before tax and Roth contributions not to exceed 6% of the participant's annual compensation." 2020 401(k) Plan Auditor Report at 6. Under the PSP Plan, employees are not required to make

14

contributions but, instead, Deloitte makes all contribution on their behalf. 2020 PSP Plan Auditor Report at 5.

46.50.  Like other companies that sponsor 401(k) plans for their employees, Deloitte enjoys both direct and indirect benefits by providing matching contributions to the PlanPlans' participants.  Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https:/www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

47.51.  Deloitte also benefits in other ways from the Plan'sPlans' matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

48.52.  Given the size of the PlanPlans, Deloitte likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

49.53.  With regard to the 401(k) Plan, participants are immediately vested in the contributions they made to their account. 2020 401(k) Auditor Report at 6. Participants hired before May of 2011 are immediately vested in any matching contributions made by Deloitte. *Id.* Vesting for participants hired after May of 2011 are subject to a sliding scale based on years of service. *Id.* With regard to the PSP Plan, participants are generally not vested until the time of retirement or should they terminate their position with Deloitte. 2020 PSP Auditor Report at 7.

**The *Plan'sPlans' Investments***

50.    In theory, the Committee determines the appropriateness of the Plans' investment offerings and monitors investment performance. Master Trust at 1. As will be discussed in more detail below, the Committee fell well short of these fiduciary goals.

51.    Several funds were available to Plan participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.

52.54. The 401(k) Plan's assets under management for all funds as of May 30, 2020 was $7,340,436,837. 2020 401(k) Auditor Report at 4. The PSP Plan's assets under management for all funds as of May 30, 2020 was $7,268,072,236. 2020 PSP Auditor Report at 4.

### Payment of Plan Expenses

53.55. During the Class Period, administrative expenses were paid for using the Plans'Plans assets. As described in the 2020 Auditor Reports: "[f]ees incurred by the Plan for the investment management services and certain participant recordkeeping fees are included in net appreciation (depreciation) in fair value of investments, because they are paid through revenue sharing, rather than a direct payment from the Plan." 2020 401(k) Auditor Report at 7 and 2020 PSP Auditor Report at 8.

## VI.    THE PLAN'SPLANS' FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of the Circumstances Demonstrates that the Plan'sPlans' Fiduciaries Failed to Administer the Plans in a Prudent Manner

54.56. As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

57.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 2022 WL 19935, at *3.

16

55. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for monitoring the Plans' fees, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") In fact, in an attempt to discover the details of the Plans' mismanagement, on October 6, 2020, the Plaintiffs wrote to Deloitte requesting, *inter alia*, meeting minutes from the Committee. By Letter dated, November 11, 2020, Deloitte denied Plaintiffs' request for these meeting minutes.

56. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding Defendants' decision-making processes based upon the numerous factors set forth below.

57. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plans and the assets of participants.

**B. Defendants Failed to Adequately Monitor the Plans' Administrative and Recordkeeping Expenses**

58. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers. Numerous recordkeepers in the marketplace are capable of providing a

17

high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan.

59.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

60.     **ERISA's Fee Disclosure Rule**

61.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [7]

62.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.  Vitagliano Decl., ¶ 40.

63.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.
[7] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

18

an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

64.    The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

65.    A plan's participants do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.  Vitagliano Decl., ¶¶ 39-41.

66.    Instead, plan administrators have a separate obligation under 29 CFR § 2550.404a-5 to disclose plan-related information, including fees for certain services to participants.  Among other things, fiduciaries are required to provide plan participants "[a] description of the services to which the charges relate (*e.g.*, plan administration, including recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B).

**B. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants**

67.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

68.    Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost.  Vitagliano Decl., ¶¶ 28-35.  In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.  Numerous recordkeepers in the marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. Vitagliano Decl., ¶¶ 29, 33,35.

19

69.    There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include the following services:

A.  Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.  Multi-channel participant and plan sponsor access (e.g. phone, web);

C.  Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.  Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.  Participant tax reporting services (e.g., IRS Form 1099-R);

F.  Participant confirmations, statements, and standard notices;

G.  Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.  Participant education (e.g. newsletters, web articles, standard communication materials);

I.  Plan consulting (e.g., preapproved document services, operational materials);

J.  Plan consulting (e.g. preapproved document services, operational compliance support).

*See* Vitagliano Decl., ¶ 26.

70.    These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan.  Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services.  Vitagliano Decl., ¶ 27.

71.    The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  Vitagliano Decl., ¶ 29 (opining *inter alia* that "Recordkeepers for large 401(k) plans such as Vanguard and Fidelity invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*,

20

website, call center, and some print services). These costs also do not materially change if the recordkeeper gains a new plan or loses an existing plan, and don't vary based on the amount of assets in the plan or in an individual's account.")

72.    The cost of providing recordkeeping services often depends on the number of participants in a plan.  In other words, "[m]ost of the cost of recordkeeping and administration of a 401(k) plan is directly linked to the number of participant accounts within the plan rather than the amount of assets in a participant's account. Accordingly, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee."  Vitagliano Decl., ¶ 23.

73.    The way it works in part, is that "[e]ach participant's account incurs transactions such as contributions, distributions, asset allocation changes, and less frequently, loans and distributions and participant reports.  Each participant's account balance is updated daily, reflecting the aforementioned activities as well as investment returns.  In this manner a participant's account is somewhat similar to a simplified brokerage account with only a few investment positions. As a result, the cost of recordkeeping a participant's account with a balance of $500,000 is the same as for a participant whose account balances is $5,000 in the same plan." Vitagliano Decl., ¶ 24.

74.    Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  "When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increase, the average cost per participant decreases." Vitagliano Decl., ¶ 30.  *See also* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that

21

substantially reduce per capita costs as plan size increases." [8]  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis. [9]

75.    Although the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan.  Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider. Vitagliano Decl., ¶ 33.

76.    "Recordkeeping and annual account administration add no monetary value to the account and act solely as a necessary expense decreasing investment returns.  There is no rational economic reason for the record keeper, or account administrator to receive increased revenues simply based upon increased investment returns, and increased account balances, or employee additional retirement savings' contributions." Vitagliano Decl., ¶ 34.

59.77.  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

---

[8] *See* https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

[9] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

60.78.  Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for plan participants (*e.g., see* allegations *infra*).  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited January 17, 2021).

### C.  Much Information Regarding the Reasonableness of Fees for Recordkeeping Services Are in the Sole Possession of Defendants

79.     As noted above, 408(b)(2) disclosures provided to plan sponsors and fiduciaries are generally not made available to plan participants.  The same is true for Plaintiffs and this Plan, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

61.    Other information has also not been made available to Plaintiffs.  For example, aThe cost of recordkeeping services depends on the number of participants (or participant accounts), not on the amount of assets in the participant's account.[10]  Thus, prudent fiduciaries negotiate a fixed dollar amount for the recordkeeper's annual compensation, usually based on a rate of a fixed dollar amount per participant rather than as a percentage of assets. *See* Mercer Best Practices at 3.  Otherwise, as plan assets grow the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.  Because of economies of

---

[10] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan."  There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets."  Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

scale, large plans get lower effective rates per participant than smaller plans. Plans with 5,000 participants or more can obtain much lower rates per participant than a plan with 500 participants.

80. plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

81. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[11]

82. Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

83. Additionally, documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise

---

[11] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

24

memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

84.    In an attempt to discover the details of the Plan's mismanagement, on October 6, 2020, the Plaintiffs wrote to Deloitte requesting, *inter alia*, meeting minutes from the Committee. By Letter dated, November 11, 2020, Deloitte denied Plaintiffs' request for these meeting minutes.

85.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process.  But in most cases, even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

86.    In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

87.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

25

88.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the imposition of excessive administrative and record keeping fees which wasted the assets of the Plan and the assets of participants.

**D. Circumstantial Facts and Evidence Plausibly Show the Plan Paid Unreasonable Fees and/or the Plan's Fiduciaries Failed to Engage in a Prudent Process to Evaluate Fees**

**1. There is No Indication Defendants Conducted RFPs at Reasonable Intervals**

89.    As noted above, 408(b)(2) disclosures are not available to plan participants. By the same token, because 408(b)(2) disclosures are provided from a service provider to its client, the disclosures are not available to any other plan fiduciary either. Accordingly, as noted above, the best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable recordkeeping fees is to conduct a RFP.

90.    Vanguard served as the Plan's recordkeeper throughout the Class Period. In 2020, Vanguard, was in the top 10 of recordkeepers as measured by assets being recordkept:

2020 TOP PROVIDERS (RECORDKEEPERS)[12]

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

91.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct a RFP to any recordkeeper including any of the above recordkeepers who were peers of Vanguard

---

[12] *See https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/*

26

and capable of providing lower recordkeeping fees as will be shown below. *See also* Vitagliano Dec., Section C ("The Deloitte Plan Paid Excessive Per Participant Record Keeping Fees").

92.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. *See, e.g.,* Vitagliano Dec., ¶ 28.

93.    The fact that the Plan has  stayed with the same recordkeeper, namely Vanguard since at least 2004, paid an increasing amount in recordkeeping fees from 2018 to the present, and paid outrageous amounts for recordkeeping from 2015 to 2017 (nearly **3x** the amount similarly-situated plans paid), there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

**2.The Vitagliano Declaration, Market Surveys, Form 5500s, and other Sources Noted Below are Reliable Sources for Participants to Determine Whether the Plan's Recordkeeping Fees are Unreasonable**

62.94.  As demonstrated in the charts below, using a mixture of revenue sharing and direct costs to pay for recordkeeping resulted in a worst-case scenario for the Plan'sPlans' participants because it saddled the Plan'sPlans' participants with above-market administrative and recordkeeping fees throughout the Class Period. Vanguard acted as the recordkeeper throughout the Class Period.

63.95.  The Plan'sPlans' per participant total administrative and recordkeeping fees were as follows:

27

| 401(k) Plan -- Per Participant Costs | | | | | |
|---|---|---|---|---|---|
| Year | Participants | Direct Costs | Indirect Costs[13] | Total | Per Participant |
| 2019 | 81,639 | $5,326,534 | $54,789 | $5,381,323 | $65.92 |
| 2018 | 76739 | $5,187,016 | $208,569 | $5,395,585 | $70.31 |
| 2017 | 70264 | $3,620,793 | $602,551 | $4,223,344 | $60.11 |
| 2016 | 65814 | $4,044,412 | $562,473 | $4,606,885 | $70.00 |
| 2015 | 62114 | $2,871,393 | $829,049 | $3,700,442 | $59.58 |

96.    When looking at just *direct* costs, the Plan's per participant costs were as follows:

| PSP Plan -- Per Participant Costs | | | | | |
|---|---|---|---|---|---|
| Year | Participants | Direct Costs | Indirect Costs[7] | Total | Per Participant |
| 2019 | 81,6397388 | $5,326,5341,533,491 | $65.24101,369 | $1,634,860 | $221.29 |
| 2018 | 767397193 | $5,187,0161,427,413 | $67.59224,446 | $1,651,859 | $229.65 |
| 2017 | 702646888 | $3,620,7931,221,118 | $51.531,033,432 | $2,254,550 | $327.32 |
| 2016 | 658146710 | $4,044,412995,753 | $61.45971,086 | $1,966,839 | $293.12 |
| 2015 | 621146492 | $565,456 | $1,583,481 | $2,871,393148,937 | $46.23331.01 |

**Deleted Cells**
**Deleted Cells**
**Deleted Cells**
**Deleted Cells**
**Deleted Cells**

64.97.  The above fees, whether looking at just direct payments made to Vanguard or both direct payments and indirect payments, were astronomical when benchmarked against similar plans.  For purposes of this Amended Complaint, Plaintiffs compare only the direct costs paid to Vanguard with the costs paid by other plans to illustrate the excessive nature of the RKA fees which were more than double a reasonable rate, even just looking at the direct costs.

---

[13] Indirect costs are estimated by identifying the funds in the Plan that pay revenue sharing and calculating those amounts using the most recent expense ratios for those funds. This number is potentially conservative as additional revenue sharing will likely be uncovered during discovery.

98.    For purposes of determining whether the Plan's fees were reasonable, it is significant to consider the fees paid by the PSP participants which upon information and belief was also recordkept by Vanguard:

| Year | Participants | Direct Costs | Per Participant |
|------|--------------|--------------|-----------------|
| 2019 | 7388 | $1,533,491 | $207.57 |
| 2018 | 7193 | $1,427,413 | $198.44 |
| 2017 | 6888 | $1,221,118 | $177.28 |
| 2016 | 6710 | $995,753 | $148.40 |
| 2015 | 6492 | $565,456 | $87.10 |

65.99.  At all times during the Class Period, the PSP Plan had at least $4.8 billion dollars in assets under management.  At the end of 2020 and 2019, the PSP Plan had over $7.2 billion dollars and $6.7 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. The May 30, 2020 Report of Independent Auditor of the Deloitte Profit Sharing Plan ("2020 PSP Auditor Report") at 3.During the Class Period, the combined Plans had a low of approximately 68,606 total participants in 2015 to a high of 89,027 total participants in 2019 making it eligible for some of the lowest fees on the market.

100.    According to Mr. Vitagliano, an expert with "35 years of experience in the record keeping and administration business and the related asset management processing," Vitagliano Decl., ¶ 3, "the Plan should have been able to obtain per participant recordkeeping fees of $23-$26. I determined this figure by looking at the following factors: for each of the comparison plans, versus the Deloitte Plan, I compared the features of the plans, (e.g. vesting, eligibility, distributions), number of plan participants, the number and nature of the investment options, the record keeping and administrative services available and utilized for plans of the size of the comparator and Deloitte Plans, the participant services available and utilized for plans of the size of the comparator and Deloitte Plans, and the reputation of the record keepers." *Id.* at ¶ 47.

101.   As part of his analysis, Mr. Vitagliano also compared record keeping fees between the Deloitte Plan and other plans record kept by Vanguard and Fidelity.  comparing record keeping fees between the Deloitte plans and those other plans record kept by Vanguard and those plans record kept by Fidelity.  Vitagliano Decl. ¶¶ 54-63.  He concluded that compared to what Vanguard and Fidelity have charged for similarly situated plans, a fee of $23-26 is the reasonable amount the Plan should have paid for RKA costs.  This amount is of course well below what the Plan actually paid for RKA costs.

102.   Mr. Vitagliano also opines that "[f]or purposes of negotiating a reasonable recordkeeping fee with a record keeper, a plan sponsor should ask the recordkeeper to combine and consider the total number of plan participants with account balances in all the plans sponsored by a company," *id.* at 46, something it appears the Plan's fiduciaries didn't do here given the excessive fees paid by both the Plan and PSP Plan.

103.   In addition to Mr. Vitagliano's analysis, other objective evidence points to the unreasonableness of the Plan's fees.

66.104.   Looking at recordkeeping costs for plans of a similar size in 2018 shows that the Plan was paying higher recordkeeping fees than its peers. The chart below analyzes a few well managed plans having more than 30,000 participants and no more than $3 billion dollars in assets under management:

30

| Comparable Plans' R&A Fees Paid in 2019[14] | | | | | |
|---|---|---|---|---|---|
| Plan Name | Number of Participants | Assets Under Management | Total R&A Costs[15] | R&A Costs on Per-Participant Basis | Record-keeper |
| Publicis Benefits Connection 401K Plan | 48,353 | $3,167,524,236 | $995,358 | **$21** | Fidelity |
| Deseret 401(k) Plan | 34,938 | $4,264,113,298 | $773,763 | **$22** | Great-West |
| The Dow Chemical Company Employees' Savings Plan | 37,868 | $10,913,979,302 | $932,742 | **$25** | Fidelity |
| The Savings and Investment Plan [WPP Group] | 35,927 | $3,346,932,005 | $977,116 | **$27** | Vanguard |
| ~~Sutter Health 403(B) Savings Plan~~ | ~~77,490~~ | ~~$4,707,348,683~~ | ~~$2,430,701~~ | ~~**$31**~~ | ~~Fidelity~~ |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 46,943 | $3,793,834,091 | $1,526,401 | **$33** | Vanguard |
| Danaher Corporation & Subsidiaries Savings Plan | 33,116 | $5,228,805,794 | $1,124,994 | **$34** | Fidelity |

Thus, the Plan~~Plans~~, with over 60~~89~~,000 participants and billions of~~over $14.5 billion~~ dollars in assets in 2019, should have been able to negotiate a recordkeeping cost in the low $20 range from the beginning of the Class Period to the present. It is particularly noteworthy that Vanguard, who

---

[14] Calculations are based on Form 5500 information filed by the respective plans for fiscal 2019, which is the most recent year for which many plans' Form 5500s are currently available.

[15] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2019) at pg. 27 (defining each service code), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2019-instructions.pdf.

is the recordkeeper for the Plans, was the recordkeeper for two of the plans identified above where recordkeeping fees were dramatically less than for the Plan~~Plans~~.

**_The Fidelity Stipulation_**

105.    Fidelity, within Vanguard's peer group as described above, was the Plan's recordkeeper at all relevant times.

106.    In a recent lawsuit where Fidelity's multi-billion dollar plan with  at least 58,000 participants like the Plan was sued, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." _Moitoso et al. v. FMR, et al._, 451 F.Supp.3d 189, 214 (D.Mass. 2020); _See also_ Vitagliano Decl., ¶ 49.

107.    Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that _**Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year**_. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. _**The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).**_

_Moitoso_, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

108.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for RKA fees as low $14 and up to $21 per participant.

**_Market Surveys Demonstrate the Unreasonableness of the Plan's RKA Fees_**

32

67.109.    Another source of data that underscores the unreasonableness of the RKA costs in this case is data released by~~Further,~~ NEPC, a consulting group, which recently conducted its 15th Annual Survey titled the NEPC 2020 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[16]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.  The average plan had $1.1 billion in assets and 12,437 participants.  *See* Report at 1.

68.110.    NEPC's survey found that the majority of plans with over 15,000 participants, to use a conservative number, paid slightly over $40 per participant recordkeeping, trust and custody fees.  Report at 10.  The worst performing plans reviewed by the NEPC with over 15,000 participants paid no more than $60 per participant, but clearly Deloitte should have been able to negotiate a fee well below this mark. *Id*. When considering both the direct and indirect costs paid for recordkeeping, Deloitte paid more than $60 per participant for RKA costs.

69.111.    Finally~~Further~~, the Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for jumbo plans typically average around $35 per participant, with costs coming down every day.[17]

---

[16] Available at https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf

[17] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

33

70.112.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

71.    A plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2020 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

72.    The fact that the Plans have stayed with the same recordkeeper, namely Vanguard since at least 2004, paid an increasing amount in recordkeeping fees from 2018 to the present, and paid outrageous amounts for recordkeeping from 2015 to 2017 (nearly **3x** the amount similarly situated plans paid), there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2015 through the present – to determine whether the Plans could obtain better recordkeeping and administrative fee pricing from other service providers

34

given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

73.113.    Given the size of the Plan'sPlans' assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the PlanPlans could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan'sPlans' recordkeeper at a lower cost.

**C. Many of the Plans' Funds had Investment Management Fees in Excess of Fees for Funds in Similarly-Sized Plans**

74.1.    Defendants' lack of a prudent process to monitor the Plans' fees is evident from their failure to control recordkeeping and administration fees as described above. The fact that several funds during the Class Period were more expensive than comparable funds found in similarly-sized plans (conservatively, plans having over 1 billion dollars in assets) is further evidence of Defendants' dereliction of duty.

75.1.    In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA-governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[18]

76.114.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

---

[18] See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf ("DOL 408(b)(2) Regulation Fact Sheet")

35

77.1.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." DOL 408(b)(2) Regulation Fact Sheet.

78.    Investment options have a fee for investment management and other services. With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets. For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets. However, the expense ratio also reduces the participant's return and the compounding effect of that return. This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

79.1.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[19]

80.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant. However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size

---

[19] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

36

of the plan and its relative bargaining power. Jumbo plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

81.    According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." "Best Practices for Plan Fiduciaries," at 37.

82.    "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process. For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services. It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context. By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

83.    Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

84.    In some cases, expense ratios for the Plans' funds were *420%* above the ICI Median (in the case of T.Rowe Price Spectrum Mod GR Alle Fund) and *110%* above the ICI Median (in the case of T.Rowe Price In'l Small Cap Equity Trust C) in the same category. The high cost of the Plans' funds is also evident when comparing the Plans' funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the charts below:

| ICI Medians 401(k) Plan and PSP Plan | | | |
|---|---|---|---|
| Current Fund | 2020 Exp Ratio | Investment Style | ICI Median |
| T.Rowe Price Emerging Markets Equity Trust B | 0.80% | International Equity | 0.50% |
| T.Rowe Price In'l Small Cap Equity Trust C | 0.85% | International Equity | 0.50% |

37

| ICI Medians 401(k) Plan and PSP Plan | | | |
|---|---|---|---|
| Current Fund | 2020 Exp Ratio | Investment Style | ICI Median |
| T.Rowe Price Real Estate Fund | 0.78% | Domestic Equity | 0.30% |
| T.Rowe Price Inst. Emerging Markets Bond Fund | 0.70% | International Bond | 0.60% |
| T.Rowe Price Spectrum Mod GR Alle Fund | 0.89% | Non-Target date Balanced | 0.17% |
| Vanguard Explorer Value Fund | 0.55% | Domestic Equity | 0.30% |

85. The high cost of the Plans' funds is even more stark when comparing the Plans' funds to the average fees of funds in similarly-sized plans:

| ICI Averages 401(k) Plan and PSP Plan | | | |
|---|---|---|---|
| Current Fund | 2020 Exp Ratio | Investment Style | ICI Average |
| T.Rowe Price Emerging Markets Equity Trust B | 0.80 % | International Equity | 0.49% |
| T.Rowe Price In'l Small Cap Equity Trust C | 0.85 % | International Equity | 0.49% |
| T.Rowe Price Real Estate Fund | 0.78 % | Domestic Equity | 0.34% |
| T.Rowe Price Inst. Emerging Markets Bond Fund | 0.70 % | International Bond | 0.61% |
| T.Rowe Price Spectrum Mod GR Alle Fund | 0.89 % | Non-Target date Balanced | 0.30% |
| Vanguard Explorer Value Fund | 0.55 % | Domestic Equity | 0.34% |

86. The excessive costs of the above funds also provide indirect evidence, along with the excessive recordkeeping and administrative costs, that Defendants did not employ a prudent process to monitor the Plans' costs. Failure to select funds that cost no more than the average expense ratios for similar funds in similarly-sized plans cost Plan participants millions of dollars in damages.

38

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty of Prudence**
**(Asserted against the Committee)**

87.115.         Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

88.116.         At all relevant times, the Committee and its members during the Class Period ("Prudence Defendants") were fiduciaries of the PlanPlans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the PlanPlans or disposition of the Plan'sPlans' assets.

89.117.         As fiduciaries of the PlanPlans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the PlanPlans for the sole and exclusive benefit of the Plan'sPlans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

90.118.         The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. The Prudence Defendants selected and retained investment options in the Plans despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to control the costs of the Plan'sPlans' recordkeeping and administrative costs.

91.119.         As a direct and proximate result of the breaches of fiduciary duties alleged herein, the PlanPlans suffered millions of dollars of losses. due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the PlanPlans would not have suffered these losses, and the Plan'sPlans' participants would have had more money available to them for their retirement.

39

92.120.      Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the PlanPlans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

93.121.      The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Deloitte and the Board Defendants)**

94.122.      Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

95.123.      Deloitte and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the PlanPlans.

96.124.      In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the PlanPlans in the event that the Committee Defendants were not fulfilling those duties.

97.125.      The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had

40

adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's~~Plans'~~ investments; and reported regularly to the Monitoring Defendants.

98.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing~~:~~

(a)    ~~Failing~~ to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan~~Plans~~ suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    ~~failing to monitor the processes by which Plans investments were evaluated, their failure to investigate the availability of lower-cost share classes; and~~

(c)    ~~failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plans, all to the detriment of the Plans and Plans' participants' retirement savings.~~

~~99.~~126.As a consequence of the foregoing breaches of the duty to monitor, the Plan~~Plans~~ suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan~~Plans~~ would not have suffered these losses, and the Plan's~~Plans'~~ participants would have had more money available to them for their retirement.

~~100.~~127.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan~~Plans~~ all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**<u>PRAYER FOR RELIEF</u>**

41

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the PlanPlans all losses to the PlanPlans resulting from Defendants' breaches of their fiduciary duties, including losses to the PlanPlans resulting from imprudent monitoringinvestment of recordkeeping and administrative coststhe Plans' assets, and to restore to the PlanPlans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Defendants to disgorge all profits received from, or in respect of, the PlanPlans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Defendants as necessary to effectuate said relief, and to prevent the Defendants' unjust enrichment;

F.      Actual damages in the amount of any losses the PlanPlans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan~~Plans~~ and removal of Plan's~~Plans'~~ fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Date: _____ ~~October 13, 2021~~             **CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
PA Attorney ID #82498
(*Pro Hac Admission to be Requested*)
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Pro Hac Admission to be Requested*)
Gabrielle Kelerchian, Esquire
(*Pro Hac Admission to be Requested*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
gabriellek@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

43

Counsel for Plaintiffs and the Putative Class

44